# EXHIBIT 5

# EMPLOYMENT, NON-COMPETITION AND PROPRIETARY RIGHTS AGREEMENT

THIS EMPLOYMENT NON-COMPETITION AND PROPRIETARY RIGHTS AGREEMENT (the "Agreement") is effective as of the 21st day of June, 2012, by and between TAGNETICS, INC., a Delaware corporation (the "Company"), and KENNETH W. KAYSER (the "Employee").

## RECITALS:

A. The Company is engaged in the manufacture and sale of electronic shelf tag systems and related products and services.

B. The Company desires to employ the Employee and Employee desires to be employed by the Company as its Chief Technical Officer, subject to the terms, conditions and covenants hereinafter set forth; and

C. As a condition of the Company employing the Employee, Employee has agreed not to divulge to the public the Company's confidential information, not to solicit the Company's vendors, customers or employees and not to compete with the Company, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the agreements, covenants and conditions set forth herein, the Employee and the Company hereby agree as follows:

## ARTICLE I
## EMPLOYMENT

1.1 Employment. The Company hereby employs, engages and hires Employee, and Employee hereby accepts employment, upon the terms and conditions set forth in this Agreement. Employee is employed as the Company's Senior Vice President & Chief Technical Officer and reports directly to the President & Chief Operating Officer of the Company. The Senior Vice President & Chief Technical Officer is an Executive Officer of the Company. The duties of the Senior Vice President & Chief Technical Officer shall be those customary for such position.

1.2 Activities and Duties During Employment. Employee represents and warrants to the Company that Employee is free to accept employment with the Company and that Employee has no prior or other commitments or obligations of any kind to anyone else which would hinder or interfere with the acceptance and performance of the obligations under this Agreement.

Employee accepts the employment described in Article I of this Agreement and agrees to devote his full time and efforts to the faithful and diligent performance of the services described herein, including the performance of such other services and responsibilities as the Company may, from time to time, stipulate. Notwithstanding the foregoing, Employee may: (i) serve on the board of directors of other entities or serve in any capacity with any hobby, avocation, civic, educational, religious, professional or charitable activity or organization provided that such service does not materially interfere or conflict with his duties hereunder; (ii) make and manage personal investments of his choice;; and (iii) pursue other business activities provided that such activities do not materially interfere or conflict with his duties hereunder. Employee shall

comply with and be bound by the Company's operating policies, procedures and practices in effect from time to time during the terms of his employment.

1.3    Funding of Activities and Duties During Employment. Company represents that it will make good faith efforts to adequately budget for and fund the activities and investments necessary for Employee to execute the activities and duties of his employment with the Company. Notwithstanding the foregoing, the Employee will be subject to the standard budgeting practices of the Company and the Company's other policies and procedures including, but not limited to the Company's current and future policies and procedures related to delegation of authority.

1.4    Scheduled Work Week. Employee's work shall be performed from such locations and at such times as mutually agreed and proper to meet his responsibilities, subject to the day to day direction from the President & Chief Operating Officer of the Company.

## ARTICLE II
## TERM

2.1    Term. The term of employment under this Agreement shall be two (2) years, commencing as of the date of the Agreement (such term of employment, as it may be extended or terminated, is herein referred to as the "Employment Term"), which Employment Term shall automatically renew for additional one (1) year periods unless terminated by Employee or the Company by written notice not less than thirty (30) days prior to expiration of the then-current term.

2.2    Termination. The Employment Term and Employment of Employee may be terminated as follows:

(a)    Automatically, without the action of either party, upon the death of the Employee.

(b)    By either party upon the Total Disability of the Employee. The Employee shall be considered to have a Total Disability for purposes of this Agreement if he is unable, by reason of accident or illness or mental disability, to substantially perform his employment duties for a period of three (3) months during any period of twelve (12) consecutive months. The determination of whether a Total Disability has occurred shall be based on the determination of a physician selected by the Company. Nothing herein shall limit the Employee's right to receive any payments to which Employee may be entitled under any disability or employee benefit plan of the Company or under any disability or insurance policy or plan. During a period of Total Disability prior to termination hereunder, Employee shall continue to receive his full compensation (including base salary and bonus) and benefits.

(c)    By the Employee upon thirty (30) days' written notice to the Company.

(d)    Automatically, without the action of either party, upon expiration of the Employment Term.

(e)    By the Company "Without Cause," and without notice which shall mean a termination of the Employee's employment by the Company other than pursuant to the

2

provisions of Section 2.2(a), Section 2.2(b) and Section 2.2(f) hereof. Any termination of Employee which occurs within one year following a "Change in Control" of Company shall be deemed a termination Without Cause. For purposes of this Agreement, a "Change in Control" occurs when there is: (a) a sale of substantially all of the assets of the Company; (b) a replacement of a majority of the existing directors of the Company; (c) any person or entity that is not a shareholder of the Company as of the date of this Agreement, becomes the beneficial owner, directly or indirectly, of securities of the Company representing more than fifty percent (50%) of the Company's outstanding securities; (d) the approval of a merger, sale or consolidation of the Company with any other company, other than a merger or consolidation which would result in the voting securities of Company outstanding immediately prior thereto continuing to represent more than fifty percent (50%) of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger consolidation; or (e) the shareholders and/or board of directors of the Company approve a plan of liquidation, dissolution or winding up of the Company.

(f) By the Company for "Cause" (as defined below).

2.3 Cessation of Rights and Obligations: Survival of Certain Provisions. On the date of expiration or earlier termination of the Employment Term for any reason, all of the respective rights, duties, obligations and covenants of the parties, as set forth herein, shall except as specifically provided herein to the contrary, cease and become of no further force or effect as of the date of said termination, and shall only survive as expressly provided for herein.

2.4 Cessation of Compensation. In lieu of any severance under any severance plan that the Company may then have in effect, and subject to: (i) the receipt of a full and unconditional release from Employee; and (ii) any amounts owed by the Employee to the Company under any contract, agreement or loan document entered into after the date hereof (including, but not limited to, loans made by the Company to the Employee), the Company shall pay to the Employee, and the Employee shall be entitled to receive, the following amounts within thirty (30) days of the date of termination of his employment in full satisfaction of any obligation to Employee for termination of this Agreement:

(a) Voluntary Termination/Termination For Cause. Upon: (i) termination of the Employee's employment pursuant to Sections 2.2(c) or (f); or (ii) the expiration of the Employment Term pursuant to Section 2.2(d), because the Employee elects not to extend the Employment Term, Employee shall be entitled to receive his base salary, bonus, benefits and expense reimbursements solely through the date of termination.

(b) Death/Total Disability. Upon the termination of the Employment Term by reason of the death or Total Disability of the Employee, pursuant to Sections 2.2(a) or (b), the Employee (or, in the case of death, his estate) shall be entitled to receive his base salary through the date of death or determination of Total Disability plus twelve (12) months, which shall include any of his unused vacation pay and unpaid bonus (if any) (subject to applicable withholding tax) based on the percentage of the calendar year through the date of termination of employment, multiplied by the bonus earned by the Employee in the immediately preceding calendar year.

(c) Without Cause. If Employee's employment is terminated Without Cause, pursuant to Section 2.2(e), Employee will be entitled to receive: (i) his base salary

3

through the date of termination; plus (ii) twelve months' additional base salary (payable over the next twelve months consistent with normal payroll practice; plus (iii) any of his unused vacation pay; plus (iv) and unpaid bonus (if any) (subject to applicable withholding tax) based on the percentage of the calendar year through the date of termination of employment, multiplied by the bonus earned by the Employee in the immediately preceding calendar year.

Provided that Employee makes a timely election to continue coverage under the Company's group health plans pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), health insurance benefits with the same coverage (subject to Company's right to change coverage as set forth in the last sentence of this Section) provided to Employee prior to the termination (e.g. medical, dental, optical, mental health) will be provided at the Company's cost for eighteen (18) months following the termination date, but not longer than until Employee is covered by comparable health insurance benefits from another employer or is otherwise ineligible for COBRA continuation coverage. Nothing contained herein shall restrict the ability of the Company or its successor from changing some or all of the terms of such health insurance benefits, the cost to participants or other features of such benefits; provided, however, that all similarly situated participants are treated the same.

    2.5    Business Expenses.

        (a)    Reimbursement. The Company shall reimburse the Employee for all reasonable, ordinary, and necessary business expenses incurred by him in connection with the performance of his duties hereunder, including, but not limited to, ordinary and necessary travel expenses and entertainment expenses. The reimbursement of business expenses will be governed by the policies for the Company and the terms otherwise set forth herein.

        (b)    Accounting. The Employee shall provide the Company with an accounting of his expenses, which accounting shall clearly reflect which expenses were incurred for proper business purposes in accordance with the policies adopted by the Company and as such are reimbursable by the Company. The Employee shall provide the Company with such other supporting documentation and other substantiation of reimbursable expenses as will conform to Internal Revenue Service or other requirements. All such reimbursements shall be payable by the Company to the Employee within a reasonable time after receipt by the Company of appropriate documentation therefore.

    2.6    Cause. For purposes of this Agreement, "Cause" for Employee's termination will exist if the Company terminates Employee's employment for any of the following reasons: (i) Employee willfully fails to substantially perform his duties hereunder (other than any such failure due to his physical or mental illness), and such willful failure is not remedied within ten (10) business days after written notice from the Company's board of directors, which written notice shall state that failure to remedy such conduct may results in an involuntary termination for Cause; (ii) Employee engages in willful and serious misconduct (including, but not limited to, an act of fraud or embezzlement) that has caused or is reasonably expected to result in material injury to the Company or any of its Affiliates; (iii) Employee is convicted of or enters a plea of guilty or nolo contendere to a: (A) crime that materially adversely affects his ability to perform his duties on behalf of the Company; or (B) felony; or (iv) Employee engages in alcohol or substance abuse which adversely affects his ability to perform his duties.

4

## ARTICLE III
## COMPENSATION AND BENEFITS

3.1 **Compensation**. During Employee's employment, the Company shall pay Employee such salary, bonus and other benefits and awards as set forth on Exhibit A. The Company and Employee mutually acknowledge that, based on the background, experience and credentials of the Employee, the initial compensation set forth in Exhibit A is not representative of the fair market compensation that might otherwise be available to the Employee from other potential employers. Accordingly, the Company will, at the sole discretion of the Board of Directors, consider good faith adjustments to the nature, timing and amount of the Employee's compensation as the financial performance of the Company allows.

3.2 **Payment**. Except as otherwise provided herein, all compensation shall be payable in intervals in accordance with the general payroll payment practice of the Company. The compensation shall be subject to such withholdings and deductions by the Company as are required by law.

3.3 **Vacation**. The Employee shall be entitled to receive 160 hours of personal time off ("PTO") each year of the Employment Term beginning on the date hereof and continuing with each one year extension of the Employment Term; any PTO time not taken during each year of the Employment Term shall carry over to the next year, subject to a maximum aggregate carryover of 80 hours of PTO.

3.4 **Other Benefits**. Employee shall be entitled to participate in any retirement, pension, profit-sharing, stock option, health plan, insurance, disability income, incentive compensation and welfare or any other benefit plan or plans of the Company which may now or hereafter be in effect and for which the Employee is eligible or for which all senior executives in general are eligible. Notwithstanding the forgoing, the Company shall be under no obligation to institute or continue the existence of any such benefit plan.

## ARTICLE IV
## CONFIDENTIALITY, NON-SOLICITATION, NON-COMPETE
## AND QUIT CLAIM AGREEMENT

4.1 **Non-Disclosure of Confidential Information**. Employee hereby acknowledges and agrees that, as of a result of the employment hereunder, Employee will acquire, develop, and use information that is not generally known to the public or to the Company's industry, including but not limited to, certain records, phone locations, documentation, software programs, price lists, customer lists, contract prices for the Company's services, business plans and prospects of the Company, equipment configurations, ledgers and general information, employee records, mailing lists, manufacturing techniques, product formulations, accounts receivable and payable ledgers, financial and other records of the Company or its affiliates, and other similar matters, as well as any information disclosed to the Company by any third party under which the Company has a confidentiality obligation to the third party (all such information pertaining to the Company, its affiliates or disclosed to Company under confidentiality from third parties being hereinafter referred to as "Confidential Information"). Employee further acknowledges and agrees that the Confidential Information is of great value to the Company and its affiliates and that the restrictions and agreements contained in this Agreement are reasonably necessary to protect the Confidential Information and the goodwill of the Company. Accordingly, Employee hereby agrees that:

5

(a) Employee will not, while employed by the Company or for two years thereafter, directly or indirectly, except in connection with Employee's performance of the duties under this Agreement, or as otherwise authorized in writing by the Company for the benefit of the Company or its "Affiliates" (as hereinafter defined), divulge to any person, firm, corporation, limited liability company, or organization, other than the Company or its Affiliates (hereinafter referred to as "Third Parties"), or use or cause or authorize any Third Parties to use, the Confidential Information, except as required by law; and

(b) Upon the termination of Employee's employment for any reason whatsoever, Employee shall deliver or cause to be delivered to the Company any and all Confidential Information, including drawings, notebooks, notes, records, keys, disks data and other documents and materials belonging to the Company or its Affiliates which is in his possession or under his control relating to the Company or its Affiliates or abstracts therefrom, regardless of the medium upon which it is stored, and will deliver to the Company upon such termination of employment any other property of the Company or its Affiliates which is in his possession or control.

4.2 <u>Non-Solicitation Covenant</u>. Employee hereby covenants and agrees that while employed by the Company and for a period of one (1) year following the termination of the Employee's employment with the Company for any reason, Employee shall not: (i) directly or indirectly, endeavor to entice away from the Company or its Affiliates any person, firm, corporation, limited liability company or other entity that was a customer of the Company at any time while Employee was an employee of the Company or its Affiliates or who is a "prospective vendor or customer" of the Company; or (ii) induce, attempt to induce or hire any employee (or any person who was an employee during the year preceding the date of any solicitation) of the Company or its Affiliates to leave the employ of the Company or its Affiliates or to otherwise perform services directly or indirectly for others, or in any way interfere with the relationship between any such employee and the Company or its Affiliates. For purposes hereof, "prospective vendor or customer" shall mean any person or entity which has been solicited for business by Employee or any officer or other employee of the Company or its Affiliates at any time during Employee's employment.

4.3 <u>Non-Competition Covenant</u>. Employee acknowledges that the covenants set forth in this <u>Section 4.3</u> are reasonable. Employee also acknowledges that the enforcement of the covenants set forth in this <u>Section 4.3</u> will not preclude Employee form being gainfully employed in such manner and to the extent as to provide a standard of living for himself, the members of his family and the others dependent upon him of at least the level to which he and they have become accustomed and may expect. Employee hereby agrees that he shall not, during his employment and for a period of one (1) year after the end of his employment directly or indirectly, engage in any proprietorship, partnership, firms trust, company, limited liability company or other entity, other than the Company (whether as owner, partner, trustee, beneficiary, stockholder, member, officer, director, employee, independent contractor, agent, servant, consultant, manager, lessor, lessee, or otherwise) that competes with the Company in the Business of the Company in the Restricted Territory (as defined herein), other than acquiring an ownership interest in a company listed on a recognized Stock exchange in an amount which does not exceed five percent (5%) of the outstanding Stock of such corporation. The term can be extended by the company for an annual fee of $42,000. For purposes of this Agreement: (i) the term "Business of the Company" shall include all business activities and ventures related to the

6

sale of electronic shelf label systems and associated parts, components, software and products derivative of any of the foregoing, and all other businesses in which the Company subsequently is engaged in prior to, and on the date of, termination of Employee's employment; and (ii) the term "Restricted Territory" means any state in the United States of America.

    4.4    <u>Remedies</u>.

        (a)    <u>Injunctive Relief</u>. Employee expressly acknowledges and agrees that a violation of any of the provisions of <u>Sections 4.1, 4.2 or 4.3</u> could cause immediate and irreparable harm, loss and damage to the Company not adequately compensable by a monetary award. Employee further acknowledges and agrees that the time periods and territorial areas provided for herein are reasonable in order to adequately protect the Business of the Company, the enjoyment of the Confidential Information and the goodwill of the Company. Without limiting any of the other remedies available to the Company at law or in equity, or the Company's right or ability to collect money damages, Employee agrees that any actual or threatened violation of any of the provisions of <u>Sections 4.1, 4.2, or 4.3</u> may be immediately restrained or enjoined by any court of competent jurisdiction, injunction may be issued in any court of competent jurisdiction, without notice and without bond. Notwithstanding anything to the contrary contained in this Agreement, the provisions of this <u>Article IV</u> shall survive the termination of Employee's employment.

        (b)    <u>Enforcement</u>: It is the desire of the parties that the provisions of <u>Sections 4.1, 4.2, or 4.3</u> be enforced to the fullest extent permissible under the laws and public policies in each jurisdiction in which enforcement might be sought. Accordingly, if any particular portion of <u>Sections 4.1, 4.2 or 4.3</u> shall ever be adjudicated as invalid or unenforceable, or if the application thereof to any party or circumstance shall be adjudicated to be prohibited by or invalidated by such laws or public policies, such section or sections shall be: (i) deemed amended to delete there from such portions so adjudicated; or (ii) modified as determined appropriate by such a court, such deletions or modifications to apply only with respect to the operation of such section or sections in the particular jurisdictions so adjudicating on the parties and under the circumstances as to which so adjudicated.

        (c)    <u>Legal Fees</u>. In any action to enforce the terms of this Agreement, the prevailing party shall be entitled to reimbursement from the other party of reasonable legal fees and costs.

    4.5    <u>Company</u>. All references to the Company in this <u>Article IV</u> shall include "Affiliates" of the Company, as that term is construed under Rule 405 of the Securities Act of 1933, as amended.

    4.6    <u>Quit Claims</u>. By execution of this Agreement, Employee: (i) assigns and quit claims to the Company all right, title and interest as relates to the Business of the Company in any patentable or potentially patentable invention or design within the meaning of Title 35 of the United States Code, and any utility or design created or discovered by the Employee during the course of his employment with the Company; and (ii) agrees that if during the course of his employment by the Company, he discovers, invents or produces, without limitation, any information, formulae, product, device, software, system, technique, drawing, program or process, which is a "trade secret" within applicable law or deemed to be such in the opinion of

7

the Company's board of directors, such information formulae, product, device, system, technique, drawing, program or process shall be assigned to the Company. Employee agrees to fully cooperate with the Company in: (A) protecting the value and secrecy of any such trade secrets, and further agrees to execute any and all documents the Company deems necessary to document any such assignment to the Company; and (B) Employee designates the Company his attorney-in-fact to execute any documents the Company may deem necessary that relates to any such trade secret or assignment thereof to the Company.

From approximately July 2010 through the date of this agreement, the Employee, through his affiliate, Kayser Ventures, Ltd., was engaged by the Company as a consultant. The Company and Employee acknowledge that no written agreement was executed in conjunction with Employee's work for the Company as a consultant. By execution of this Agreement, Employee further assigns and quit claims to the Company all right, title and interest as it relates to the Business of the Company in any patentable or potentially patentable invention or design within the meaning of Title 35 of the United States Code, and any utility or design created or discovered by the Employee during the course of his aforementioned engagement as a consultant for the Company. Employee agrees that consideration for his engagement as a consultant paid to his affiliate, Kayser Ventures, Ltd., together with the benefits of this Agreement, constitute fair and adequate consideration for this assignment and quit claim.

Notwithstanding anything to the contrary herein, this Agreement does not apply to any invention ("Employee Owned Invention(s)") for which no equipment, supplies, facility or trade secret information of the Company was used and which was developed entirely on the Employee's own time, unless: (a) the invention relates: (i) to the Business of the Company; or (ii) to the Company's actual research or development; or (b) the invention results from any work performed by the Employee for the Company. Except as noted on the signature page hereof, Employee claims no right in any inventions as of the date hereof.

4.7     Pursuant to Employee's previous engagement by the Company as a consultant, through Employee's affiliate, Kayser Ventures, Ltd. as described in Article IV, Section 4.6 above, the Company and Employee mutually acknowledge and agree that there was a lapse in compensation to Kayser Ventures, Ltd. for approximately a 6 month period from June 1, 2012 to on or about November 30, 2012 during which time Employee was working less than full time on activities related to the Business of the Company. The Company and Employee further mutually acknowledge and agree that the Company will pay the sum of $75,000 to Kayser Ventures, Ltd. for consulting services provided to the Company during this time period. The Company will pay Kayser Ventures, Ltd. the $75,000 in 15 equal monthly installments beginning August 1, 2012. When the anticipated $5,000,000 is raised, the balance is due.

## ARTICLE V
## MISCELLANEOUS

5.1     <u>Notices</u>.  All notices or other communications required or permitted hereunder shall be in writing addressed to the last known address of the Party entitled to notice and shall be deemed given, delivered and received: (a) when delivered, if delivered personally; (b) four (4) days after mailing, when sent by registered or certified mail, return receipt requested and postage prepaid; (c) one (1) business day after delivery to a private courier service, when delivered to a private courier service providing documented overnight service; and (d) on the date of delivery if delivered by telecopy, receipt confirmed, provided that a confirmation copy is sent on the next business day by first class mail, postage prepaid, in each case addressed as follows:

8

> To Employee at: The address set forth on the signature page hereof.
>
> To Company at: Tagnetics, Inc.
> 2650 Indian Ripple Road
> Dayton, OH 45440
> Attention: President
> Telephone: 937-320-9225
> Facsimile: 937-320-9726
> E-Mail: rearley@tagnetics.com
>
> *with a copy to:*
>
> Mitchell D. Goldsmith, Esq.
> c/o Shefsky & Froelich Ltd.
> 111 East Wacker Drive – Suite 2800
> Chicago, IL 60601
> Telephone: 312-836-4006
> Facsimile: 312-275-7569
> E-Mail: mgoldsmith@shefskylaw.com

Any party may change its address for purposes of this paragraph by giving the other party written notice of the new address in the manner set forth above.

5.2  **Entire Agreement; Amendments, Etc.**  This Agreement contains the entire agreement and understanding of the parties hereto, and supersedes all prior agreements and understandings relating to the subject matter hereof. Except as provided in Section 4.4(b) above, no modification, amendment, waiver or alteration of this Agreement or any provision or term hereof shall in any event be effective unless the same shall be in writing, executed by both parties hereto, and any waiver so given shall be effective only in the specific instance and for the specific purpose for which given.

5.3  **Benefit**.  This Agreement shall be binding upon, and inure to the benefit of, and shall be enforceable by, the heirs, successors, legal representatives and permitted assignees of Employee and the successors, assignees and transferees of the Company. This Agreement or any right or interest hereunder may not be assigned by Employee without the prior written consent of the Company.

5.4  **No Waiver**.  No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder or pursuant hereto shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder or pursuant thereto.

5.5  **Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law but, if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provision of this Agreement. If any part of any covenant is unenforceable or the making of any covenant hereunder is unenforceable, the parties hereto agree, and it is their desire, that the court shall substitute a judicially enforceable limitation in its

place, and that as so modified this Agreement, as so modified, shall be binding upon the parties as if originally set forth herein.

    5.6    <u>Compliance and Headings</u>. Time is of the essence of this Agreement. The headings in this Agreement are intended to be for convenience and reference only, and shall not define or limit the scope, extent or intent or otherwise affect the meaning of any portion hereof.

    5.7    <u>Arbitration</u>. If there is any dispute between the parties concerning any matter relating to this Agreement, the exclusive basis for adjudication of this Agreement (except with respect to the performance of the covenants and obligations as set forth in <u>Article IV</u> above) shall be by arbitration as detailed herein. Either party may submit the dispute to binding arbitration. Any such arbitration proceeding will be conducted in Dayton, Ohio and except as otherwise provided in this Agreement, will be conducted under the auspices of JAMS/Mediation, Inc., in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association. The arbitrator shall allow such discovery as the arbitrator determines appropriate under the circumstances. The arbitrator shall determine which party, if either, prevailed and shall award the prevailing party its costs. Each party will bear his, her or its respective attorneys' fees. The award and decision of the arbitrator shall be conclusive and binding on all parties to this Agreement and judgment on the award may be entered in any court of competent jurisdiction. The parties acknowledge and agree that any arbitration award may be enforced against either or both of them in a court of competent jurisdiction and each waives any right to contest the validity or enforceability of such award. The parties further agree to be bound by the provisions of any statute of limitations which would be applicable in a court of law to the controversy or claim which is the subject of any arbitration proceeding initiated under the Agreement. The parties further agree that they are entitled in any arbitration proceeding to the entry of an order, by a court of competent jurisdiction pursuant to an opinion of the arbitrator, for specific performance of any of the requirements of this Agreement.

In any action to enforce any of the provisions of <u>Article IV</u> hereof, the action shall be litigated in the state or federal courts situated in or closest to Dayton, Ohio, to which jurisdiction and venue all parties consent. Each party hereby waives his, her or its right to trial by jury with respect to such action and agrees that the prevailing party such action shall be entitled to reimbursement from the other party of his, her or its legal fees and costs incurred in connection with such actions. Company shall be entitled to injunctive relief, without the necessity of posting bond to remedy any breach of any of the terms of <u>Article IV</u> of this Agreement by Employee.

    5.8    <u>Governing Law</u>. The parties agree that this Agreement shall be governed by, interpreted and construed in accordance with the laws of the State of Delaware. Any action to enforce the terms of this Agreement shall be litigated in the state or federal courts situated in or nearest to Dayton Ohio, to which jurisdiction and venue all parties consent. All parties waive their right to a jury trial with respect to litigation of this Agreement.

    5.9    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, whether by original, photocopy, facsimile or e-mail attachment in PDF format, each of which will be deemed an original and all of which together will constitute one and the same instrument.

    5.10    <u>Recitals</u>. The Recitals set forth above are hereby incorporated in and made a part of this Agreement by this reference.

5.11 <u>Indemnification</u>. The Company shall indemnify and hold Employee harmless to the fullest extent permitted by law and under the Articles and bylaws of the Company as, to and from any and all costs, expenses (including reasonable attorneys' fees, which shall be paid in advance by the Company, subject to recoupment in accordance with applicable law) or damages incurred by Employee as a result of any claim, suit, action or judgment arising out of the activities of the Company or its Affiliates or the Employee's activities as an employee, officer or director of the Company or any related company; provided, however that the Employee shall not be entitled to indemnification hereunder to the extent the damages are the result of actions or omissions which have been finally adjudicated by a court of competent jurisdiction to constitute gross negligence or willful or intentional misconduct by the Employee. This provision shall survive the termination of this Agreement.

5.12 <u>Survival</u>. Employee's obligations under <u>Article IV</u> hereof shall survive any termination of this Agreement.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed and delivered as of the day and year first above written.

COMPANY:

TAGNETICS, INC.

By: _Ronald E. Earley_
Ronald E. Earley
President & Chief Operating Officer

EMPLOYEE: _/s/ Kenneth W. Kayser_
KENNETH W. KAYSER

Address: _____
_____

*Employee Owned Inventions:* _____

1168096_3

# EXHIBIT A

| | |
|---|---|
| *Base Salary*............... | $250,000 per annum, subject to increase in the sole discretion of the Board of Directors of the Company. The first $180,000 of the Employee's annual compensation will be paid currently. The remaining $70,000 of annual salary will be deferred in accordance with the terms of the Company's Deferred Compensation Plan. |
| *Bonus*....................... | Employee shall be entitled to earn an annual bonus as determined by the Board of Directors in its sole discretion. |
| *Benefits*.................... | Employee shall be entitled to receive all offered health benefits for himself and his family, at no additional cost, in an amount not less than the greatest level of coverage offered to other employees in the Company. Employee will be eligible for consideration for annual grants with respect to the Company's stock option plan, as determined in the sole discretion of the Board of Directors. |

1168096_3