IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
DAYTON DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 (Involuntary) |
| | ) | |
| TAGNETICS INC., | ) | Case No. 19-30822 |
| | ) | |
| Alleged Debtor. | ) | |
| | ) | |

### TAGNETICS INC.'S MOTION TO DISMISS AND COMPEL ARBITRATION AS TO ALLEGED CLAIMS FILED BY ALLEGED INDIVIDUAL CREDITORS KAYSER, EARLEY, AND HAGER

Tagnetics, Inc. ("Tagnetics"), by and through its undersigned counsel, hereby submits this Motion to Dismiss and Compel Arbitration as to the Alleged Claims Filed by Alleged Individual Creditors Kayser, Earley, and Hager.  As explained in greater detail below, the claims asserted by Kenneth Kayser ("Kayser"), Ronald E. Earley ("Earley"), and Jonathan Hager ("Hager") seek the payment of wages based on the terms of their employment agreements, but those employment agreements all contain provisions that mandate any claims arising under the agreements are to be decided in arbitration.  Accordingly, those claims should be dismissed and adjudicated in arbitration, not before this Court.

1.     This case was commenced on or about March 19, 2019 when (1) Kayser, (2) Earley, (3) Hager, (4) Robert Strain ("Strain"), (5) Kayser Ventures Ltd. ("KVI"), and (6) S-Tek Inc. ("STI") (collectively "Petitioning Creditors") filed an Involuntary (bankruptcy) Petition Against a Non-Individual, with the non-individual being Tagnetics.

2.     The alleged corporate creditors, KVI and STI, filed claims for unpaid equipment rental and an unpaid invoice, respectively.

3.     The alleged individual creditors, Kayser, Earley, Hager, and Strain, filed claims for unpaid wages.  *See* Exhibit 1 (Response to Interrogatories and Requests for Production of

1

Documents from Kenneth Keyser) at Answer to Interrogatory No. 3; Exhibit 2 (Response to Interrogatories and Requests for Production of Documents from Ronald E. Earley) at Answer to Interrogatory No. 3; Exhibit 3 (Response to Interrogatories and Requests for Production of Documents from Jonathan Hager) at Answer to Interrogatory No. 3; Exhibit 4 (Response to Interrogatories and Requests for Production of Documents from Robert Strain).[1]

4.    Kayser, Earley, and Hager all executed Employment, Non-Competition and Proprietary Rights Agreements with Tagnetics (collectively, the "Employment Agreements" and, individual, each being an "Employment Agreement").  All the Employment Agreements include identical arbitration clauses, which provide in relevant part:

> 5.7    Arbitration. If there is any dispute between the parties concerning any matter relating to this Agreement, the exclusive basis for adjudication of this Agreement (except with respect to the performance of the covenants and obligations as set forth in Article IV above) shall be by arbitration as detailed herein. Either party may submit the dispute to binding arbitration. Any such arbitration proceeding will be conducted in Dayton, Ohio and except as otherwise provided in this Agreement, will be conducted under the auspices of JAMS/Mediation, Inc., in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association. The arbitrator shall allow such discovery as the arbitrator determines appropriate under the circumstances. The arbitrator shall determine which party, if either, prevailed and shall award the prevailing party its costs. Each party will bear his, her or its respective attorneys' fees. The award and decision of the arbitrator shall be conclusive and binding on all parties to this Agreement and judgment on the award may be entered in any court of competent jurisdiction. The parties acknowledge and agree that any arbitration award may be enforced against either or both of them in a court of competent jurisdiction and each waives any right to contest the validity or enforceability of such award. The parties further agree to be bound by the provisions of any statute of limitations which would be applicable in a court of law to the controversy or claim which is the subject of any arbitration proceeding initiated under the Agreement. The parties further agree that they are entitled in any arbitration proceeding to the entry of an order, by a court of competent

---

[1] A bona fide dispute exists as to the merits of the claims asserted by the alleged corporate creditors and the alleged individual creditors, both as to the existence of the alleged liability and, if there is liability, which there is not, the amount of the claimed liability.

{01335756-1}

> jurisdiction pursuant to an opinion of the arbitrator, for specific
> performance of any of the requirements of this Agreement.

*See* Exhibit 5 (Kayser Employment Agreement); Exhibit 6 (Earley Employment Agreement);

Exhibit 7 (Hager Employment Agreement).

5.      "Congress enacted the FAA [Federal Arbitration Act] in 1925 pursuant to its

power to regulate interstate commerce 'to ensure judicial enforcement of privately made

agreements to arbitrate,' and 'to overrule the judiciary's longstanding refusal to enforce

agreements to arbitrate.'"  *Stutler v. T.K. Constructors Inc.*, 448 F.3d 343, 345 (6th Cir. 2006)

(quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219-20 (1985)).  "The FAA creates a

body of federal substantive law of arbitrability, applicable to any arbitration agreement within

the coverage of the Act."  *Evanston Ins. Co. v. Cogswell Props., LLC*, 683 F.3d 684, 693 (6th

Cir. 2012) (quotations omitted).

6.      Under the FAA, "a written agreement to arbitrate disputes which arises out of a

contract involving transactions in interstate commerce shall be valid, irrevocable, and

enforceable, save upon such ground as exists at law or in equity for the revocation of any

contract."  *Sicherman v. World Auto Network Inc. (In re McZeal)*, 2017 Bankr. LEXIS 1458, at

*13-14 (N. Dist. Ohio May 31, 2017) (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir.

2000) (quoting 9 U.S.C. § 2)).  "When asked by a party to compel arbitration under a contract, a

federal court must determine whether the parties agreed to arbitrate the dispute at issue."  *Id.*

7.      A federal court in the jurisdiction of the United States Court of Appeals for the

Sixth Circuit must answer four questions when deciding whether to grant a motion to compel

arbitration:   (1) whether the parties agreed to arbitration; (2) the scope of the arbitration

agreement; (3) whether Congress intended for any asserted statutory claims not to be subject to

arbitration; and (4) whether to stay remaining claims if only some of the claims in the proceeding

{01335756-1}

are subject to arbitration.  *Sicherman*, 2017 Bankr. LEXIS 1458 at *14 (citing *Uszak v. AT&T*

*Mobility Servs. LLC*, 658 F. App'x 758, 761 (6th Cir. 2016)).  The answer to each of these four

questions in this case leads only to one conclusion – that the claims asserted by Kayser, Earley,

and Hager all should be dismissed and referred to arbitration for resolution, as opposed to any

federal or state court.

8.     As to the first question, there can be no dispute that Kayser, Earley, and Hager all

agreed to submit claims under their Employment Agreements to arbitration.  Section 5.7 of each

Employment Agreement clearly and unequivocally states in pertinent part that "[i]f there is any

dispute between the parties concerning any matter relating to this [Employment] Agreement, the

exclusive basis for adjudication of this [Employment] Agreement . . . shall be by arbitration."

*See* Exs. 1-3 at Section 5.7.

9.     As for the second question, there can be no dispute that Kayers's, Earley's, and

Hager's claims all arise out of their Employment Agreements and, thus, fall within the scope of

the arbitration clause.  Kayser, Earley, and Hager all assert claims for unpaid wages based on

their respective Employment Agreements.  *See* Ex. 1 at Answer to Interrogatory No. 3 (stating

"[m]y employment contract . . . show[s] unpaid salary of $407,580" and "[o]utstanding deferred

salary of $455,000" as well as "unpaid expenses and insurance stipend"); Ex. 2 at Answer to

Interrogatory No. 3 (stating "[m]y employment contract . . . show[s] unpaid salary of

$570,313.00" and "unpaid expenses" as well as "I am probably due salary"); Ex. 3 at Answer to

Interrogatory No. 3 (stating "Tagnetics owes Jonathan Hager $70,644.79" pursuant to the

"Employment, Non-Competition and Proprietary Rights Agreement" entered into "on July 5,

2013 with an agreed Base Salary of $155,000 per annum"); *see also* Involuntary Petition Against

a Non-Individual at 3 (asserting "unpaid wages" due to Kenneth W. Kayser, asserting

4

"employment agreement unpaid salary" due to Ronald E. Earley, and (asserting "employment agreement unpaid salary" due to Jonathan Hager). Thus, there is no dispute that the claims for unpaid wages and expenses arise out of the Employment Agreements, which contain arbitration provisions, and, thus, their claims are subject to the arbitration clauses.[2]

10.     The third question – whether Congress intended for any asserted statutory claims are not subject to arbitration – involves a more in-depth inquiry and analysis. "Like any statutory directive, the [FAA's] mandate may be overridden by a contrary congressional command." *In re No Place Like Home, Inc.*, 559 B.R. 863, 871 (W. Dist. Tenn. Oct. 27, 2016) (quoting *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987)). The party opposing arbitration must demonstrate that Congress "intended to limit or prohibit waiver of a judicial forum for a particular claim." *Id.* (citing *McMahon*, 482 U.S. at 227).

11.     The party opposing arbitration may satisfy its burden in one of three ways: "(1) the statute's text, (2) the statute's legislative history, or (3) an inherent conflict between the arbitration and the statute's underlying purposes." *Id.* ("McMahon Framework"). In this case, neither Kayser, nor Earley, nor Hager can meet that burden.

12.     "The majority of courts have determined that Congress did not use statutory text or legislative history to expressly limit the FAA's application to the Bankruptcy Code." *In re No Place Like Home, Inc.*, 559 B.R. at 871 (citing *Mintze v. Am. Gen. Fin. Servs.*, 434 F.3d 222 (3d Cir. 2006)); *see also Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989); *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In the Matter of Nat'l Gypsum Co.)*, 118 F.3d 1056 (5th Cir. 1997); *Ackerman & Kuriloff v. Eber*

---

[2] The Employment Agreements not only call for the payment of salary to Kayser, Earley, and Hager, the Employment Agreements also call for the payment of expenses and certain insurance benefits. *See* Exs. 5-7 at Sections 2.4, 2.5, 3.1, 3.2, 3.3, and 3.4.

{01335756-1}

*(In the Matter of Eber)*, 687 F.3d 1123 (9th Cir. 2012*); Cont'l Ins. Co. v. Thorpe Insulation Co.*

*(In re Thorpe Insulation Co.)*, 671 F.3d 1011 (9th Cir. 2012); *The Whiting-Turner Contracting*

*Co. v. Elec. Mach. Enter., Inc. (In re Electric Machinery Enterprises, Inc.)*, 479 F.3d 791 (11th

Cir. 2007).  Thus, the first two options under the McMahon Framework are not even available to

Kayser, Earley, and Hager as a matter of law.

13.    That leaves the final prong of the McMahan Framework – whether an inherent

conflict exists between the arbitration and the statute's underlying purposes – as the only

possible option for Kayser, Earley, and Hager, but that prong is not viable either.  "If an inherent

conflict does exist, the court has discretion on the issue of arbitration; but, if there is no inherent

conflict, the court *must* compel arbitration and does not have discretion to decide the issue." *In re*

*No Place Like Home, Inc.*, 559 B.R. at 871 (emphasis added).  In a recent opinion from the

United States Bankruptcy Court for the Northern District of Ohio, the court noted "courts

[generally] find no inherent conflict between arbitration and bankruptcy where the plaintiff's

claims do not implicate an underlying bankruptcy issue, but do find an inherent conflict where

"the claims at the center of the dispute were directly related to the Bankruptcy Code."

*Sicherman*, 2017 Bankr. LEXIS 1458, at *28 (citing *Kiskaden v. LVNV Funding, LLC (In re*

*Kiskaden)*, Case No. 16-20207, Adv. No. 16-2008, 571 B.R. 226, 2017 Bankr. LEXIS 996, 2017

WL 1323409, at *4 (Bankr. E.D. Ky. April 7, 2017)).

14.    In this case, there can be no dispute that the wage claims asserted by Kayser,

Earley, and Hager are unrelated to the Bankruptcy Code; they arise solely out of each of their

Employment Agreements.  At best, the nature of the claims asserted by Kayser, Earley, and

Hager fall within the purview of Ohio's wage payment laws and/or common law breach of

contract claims based on their Employment Agreements.  *See, e.g.*, *Shoots v. IQor Holdings U.S.*

6

*Inc.*, 2015 U.S. Dist. LEXIS 141617, at *26-27 (D. Minn. October 19, 2015) (holding that Ohio's

wage law, Ohio Rev. Stat. Ann. § 4113.15, is meant to provide employees with a civil remedy if

their employer fails to pay their wages within the prescribed time-frame); *Haines & Co. v.*

*Stewart*, 2001 Ohio Ct. App. LEXIS 597, at *8 (Ohio Ct. App. Feb. 5, 2001) (illustrating an

employee's breach of contract claim for employer's failure to pay wages).

15.     The case *In re No Place Like Home, Inc.*, 559 B.R. 863, is instructive here.  In

that case, the company, No Place Like Home, Inc., filed Chapter 11 bankruptcy following the

filing of numerous arbitration actions against it that alleged the claimants were improperly

classified as independent contractors and, thus, were owed overtime wages, among other things.

Many of the independent contractor/employee creditors filed claims in the bankruptcy

proceeding and moved to compel arbitration, pursuant to the arbitration clauses in their

independent contractor agreements.  *Id.* at 867-68.  The court explained that "[s]imply put, the

Claimants here merely seek to have their claims based in non-bankruptcy law heard and

determined by an arbitrator who specializes in federal wage and hour law. . .  Under these

particular facts and circumstances, allowing the parties to proceed to arbitration seemingly

would, among other things, be just, speedy and inexpensive in accordance with Fed. R. Bankr. P.

1001 and concomitantly with no appeals."  *Id.* at 875.

16.     Although Tagnetics, the alleged debtor in this case, is moving to compel

arbitration, rather than the alleged creditors, the logic by the court in *In re No Place Like Home,*

*Inc.*, applies with equal force here.  There is no inherent conflict between arbitration and

bankruptcy because Kayer's, Earley's, and Hager's claims are not premised on or related to the

Bankruptcy Code.  Accordingly, the Court should grant Tagnetic's Motion to Dismiss and

Compel Arbitration.

{01335756-1}

**WHEREFORE**, Tagnetics respectfully requests that this Court dismiss the claims of Kayser, Earley, and Hager, and compel arbitration of their claims, as they agreed in – and is mandated by – their Employment Agreements.  Tagnetics further requests that this Court grant such additional relief as the Court deems necessary and proper.

Respectfully submitted,

*/s/ Robert R. Kracht*[3]
Robert R. Kracht (0025574)
MCCARTHY, LEBIT, CRYSTAL & LIFFMAN CO., LPA
101 West Prospect Avenue, Suite 1800
Cleveland, Ohio 44115
Telephone:  (216) 696-1422
Facsimile:  (216) 696-1210
Email:  rrk@mccarthylebit.com

and

*/s/ Stephen B. Stern*
Stephen B. Stern, Admitted *Pro Hac Vice*
KAGAN STERN MARINELLO & BEARD, LLC
238 West Street
Annapolis, Maryland 21401
Telephone:  (410) 216-7900
Facsimile:  (410) 705-0836
Email:  stern@kaganstern.com

*Counsel for Alleged Debtor
Tagnetics, Inc.*

---

[3] Motion of McCarthy, Lebit, Crystal & Liffman Co. LPA and Robert R. Kracht, Esq. for Leave to Withdraw as Counsel, (doc. 37) is pending before the Court.

{01335756-1}

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 26, 2019, a copy of the foregoing *Motion to Dismiss and Compel Arbitration as to the Alleged Claims Filed Alleged Individual Creditors Kayser, Earley, and Hager* was served (i) **electronically** on the date of filing through the Court's ECF System on all ECF participants registered in this case at the email address registered with the court and (ii) electronically by email on counsel for Tagnetics, Inc., Stephen Stern, Esq. (Stern@kaganstern.com), Douglas Draper, Esq. (ddraper@hellerdraper.com) and Leslie Collins, Esq. (lcollins@hellerdraper.com), and (iii) by **ordinary U.S. Mail** on June 26, 2019 addressed to:

**Kenneth W Kayser**
PO Box 115
Catawba, VA 24070

**Stephen Stern, Esq.**
Kagan Stern Marinello & Beard, LLC
238 West Street
Annapolis, Maryland 21401

**Ronald E. Early**
6429 Winding Tree Drive
New Carlisle, OH 45344

**Douglas S. Draper, Esq.**
Heller, Draper, Patrick, Horn
650 Poydras Street, Suite 2500
New Orleans, LA 70130

**Jonathan Hager**
842 Paint Bank Road
Salem, VA 24153

**Leslie A. Collins, Esq.**
Heller, Draper, Patrick, Horn
650 Poydras Street, Suite 2500
New Orleans, LA 70130

**Robert Strain**
427 Artell Street
Marengo, IL 60152

**Tagnetics, Inc.**
3415 Route 36
Piqua, OH 45356

*/s/ Robert R. Kracht*
Robert R. Kracht (#0025574)

{01335756-1}

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF OHIO (DAYTON)

IN RE:                                    *            CASE NO. 19-30822

TAGNETICS INC.                            *            CHAPTER 7

    INVOLUNTARY DEBTOR            *

## RESPONSE TO INTERROGATORIES AND
## REQUESTS FOR PRODUCTION OF DOCUMENTS

### FROM:  Kenneth W. Kayser

### INTERROGATORIES

### INTERROGATORY NO. 1

Please state the name, address and substance of the anticipated testimony of any witness you may call at the trial of the Involuntary.

ANSWER: To verify the verbal agreement with me concerning life insurance benefit, history of such payments, and balances due for salary, deferred salary, and unpaid expenses; to verify my adherence to the terms of my employment contract: to verify the history of Tagnetics failure to pay its obligations the following will be called to testify:

Lou Fernandez
4437 Stonehaven Drive
Long Grove, IL 60047

Ronald E. Early
6429 Winding Tree Dr
New Carlisle, OH 45344

### INTERROGATORY NO. 2:

{01322265-1}

Please state the name, address and substance of the anticipated testimony of any witness who will testify in support of your claim against the Debtor.

ANSWER: Same as no 1

**INTERROGATORY NO. 3:**

Please state the amounts you assert are owed to you by the Debtor and what facts support the amounts you claim you are owed.

ANSWER: My employment contract and W2 statements show unpaid salary of $407,580 assuming an end date 12/31/2018. Outstanding balance of deferred salary of $455,000. Determination of balance due for unpaid expenses and insurance stipend will require the testimony of Tagnetics' former CFO.

**INTERROGATORY NO. 4:**

Please state the name, address and substance of the anticipated testimony of any witness who will testify in support of your assertion that the Debtor is not paying its debts as they come due.

Lou Fernandez
4437 Stonehaven Drive
Long Grove, IL 60047

Ronald E. Early
6429 Winding Tree Dr
New Carlisle, OH 45344

**INTERROGATORY NO. 5:**

2

Please state why you filed the Involuntary action against the Debtor, as opposed to filing suit and obtaining a monetary judgment against the Debtor in state or federal court.

ANSWER: The cost of each petitioner filing a suit would have been prohibitive and due to Tagnetics insolvency would have had the same result.

## INTERROGATORY NO. 6:

Identify and describe each communication you had with Daniel White or Michael White regarding the Involuntary and/or the Debtor.

ANSWER: I have spoken to Dan White numerous times at BOD meetings and at private meetings with John White which he routinely attended. Except for our recent exchange of emails, which are included, I recall no specific dates or topics. I have met Mike White at Compass Marketing since he has an office there but recall no specific imstance.

## PRODUCTION OF DOCUMENTS

### REQUEST FOR PRODUCTION NO. 1:

Copies of all documents that form the basis for your claim against the Debtor.

See attachment DOC1_KK.

### REQUEST FOR PRODUCTION NO. 2:

Copies of all correspondence wherein you made a demand on the Debtor for the payment of the amount you assert you are owed by the Debtor.

None, all such demands were verbal.

### REQUEST FOR PRODUCTION NO. 3:

3

Copies of all documents that were used or reviewed by you in the calculation of all claims asserted by you against the Debtor.

See attachment DOC1_KK.


**REQUEST FOR PRODUCTION NO. 4**:

Copies of all documents used or reviewed that support your assertion that the Debtor is not paying its debts as they become due.

See attachment DOC4

**REQUEST FOR PRODUCTION NO. 5**:

Copies of all correspondence sent to or received from any other Petitioning Creditor.

Since I have been involved in businesses with most of these people for decades, this request is overly broad and impossible to comply with in the time allotted. Recent correspondence has been limited to documents related to this action which are already in your possession.


**REQUEST FOR PRODUCTION NO. 6**:

Copies of all correspondence with any board member or officer of the Debtor that refers to or relates to or discusses your claim against the Debtor.

See attachment DOC6

**REQUEST FOR PRODUCTION NO. 7**:

Copies of all documents (whether emails, text messages, letters, or other communications) between you and Daniel White or Michael White concerning the Involuntary or the Debtor.

See attachment DOC7

4

Dated: May 31, 2019

Respectfully submitted,

Kenneth W Kayser
PO Box 115
Catawba, VA 24070

5

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF OHIO (DAYTON)

| | | |
|---|---|---|
| IN RE: | * | CASE NO. 19-30822 |
| TAGNETICS INC. | * | CHAPTER 7 |
| INVOLUNTARY DEBTOR | * | |

**RESPONSE TO INTERROGATORIES AND
REQUESTS FOR PRODUCTION OF DOCUMENTS**

**FROM:  Ronald E. Earley**

**INTERROGATORIES**

**<u>INTERROGATORY NO. 1</u>**

Please state the name, address and substance of the anticipated testimony of any witness

you may call at the trial of the Involuntary.

ANSWER: To verify the verbal agreement with me concerning life insurance benefit, history of

such payments, and balances due for salary, deferred salary, and unpaid expenses; to verify my

adherence to the terms of my employment contract: to verify the history of Tagnetics failure to

pay its obligations the following will be called to testify:

Lou Fernandez
4437 Stonehaven Drive
Long Grove, IL 60047

**<u>INTERROGATORY NO. 2</u>:**

Please state the name, address and substance of the anticipated testimony of any witness

who will testify in support of your claim against the Debtor.

ANSWER: Same as no 1

1

{01322265-1}

**INTERROGATORY NO. 3:**

Please state the amounts you assert are owed to you by the Debtor and what facts support the amounts you claim you are owed.

ANSWER: My employment contract and W2 statements show unpaid salary of $570,313.00 assuming the contract is still in effect 5/31/2019. Determination of balance due for unpaid expenses will require the testimony of Tagnetics' former CFO. It also needs to be stated that my image is still being used by Tagnetics on its PowerShelf website, so I am probably due salary as long as I am being advertised as a member of the team.

| 2011 | $200,000.00 | $196,153.65 | $3,846.35 |
|------|-------------|-------------|-----------|
| 2012 | $200,000.00 | $199,999.80 | |
| 2013 | $200,000.00 | $200,000.02 | |
| 2014 | $200,000.00 | $200,000.06 | |
| 2015 | $200,000.00 | $140,461.58 | $59,538.42 |
| 2016 | $200,000.00 | $143,558.39 | $56,441.61 |
| 2017 | $200,000.00 | $29,000.00 | $171,000.00 |
| 2018 | $200,000.00 | $0.00 | $200,000.00 |
| 2019 | $200,000.00 | $0.00 | $83,333.00 |

**INTERROGATORY NO. 4:**

Please state the name, address and substance of the anticipated testimony of any witness who will testify in support of your assertion that the Debtor is not paying its debts as they come due.

Lou Fernandez
4437 Stonehaven Drive

2

{01322265-1}

Long Grove, IL 60047

**INTERROGATORY NO. 5:**

Please state why you filed the involuntary action against the Debtor, as opposed to filing

suit and obtaining a monetary judgment against the Debtor in state or federal court.

ANSWER: The cost of each petitioner filing a suit would have been prohibitive and due to

Tagnetics insolvency would have had the same result.


**INTERROGATORY NO. 6:**

Identify and describe each communication you had with Daniel White or Michael White

regarding the Involuntary and/or the Debtor.

ANSWER: I not spoken or communicated to Daniel White or Michael White during either 2017

or 2018.


## PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1:**

Copies of all documents that form the basis for your claim against the Debtor.

See attachment DOC1_RE.

**REQUEST FOR PRODUCTION NO. 2:**

Copies of all correspondence wherein you made a demand on the Debtor for the payment

of the amount you assert you are owed by the Debtor.

None, all such demands were verbal.

**REQUEST FOR PRODUCTION NO. 3:**

3

{01322265-1}

Copies of all documents that were used or reviewed by you in the calculation of all claims asserted by you against the Debtor.

See attachment DOC1_RE.


**REQUEST FOR PRODUCTION NO. 4:**

Copies of all documents used or reviewed that support your assertion that the Debtor is not paying its debts as they become due.

See attachment DOC4

**REQUEST FOR PRODUCTION NO. 5:**

Copies of all correspondence sent to or received from any other Petitioning Creditor.

Since I have been involved in businesses with most of these people for decades, this request is overly broad and impossible to comply with in the time allotted. Recent correspondence has been limited to documents related to this action which are already in your possession.


**REQUEST FOR PRODUCTION NO. 6:**

Copies of all correspondence with any board member or officer of the Debtor that refers to or relates to or discusses your claim against the Debtor.

None were generated. I was called by several Tagnetics Board Members hassling me to give John White co-CEO of Tagnetics more time to secure funding for a third party source as he had told them he was very close to a deal. They would be Don Sackman and Vincent Browning. They ask for 21 days which was granted by the court so we should now know if he was successful in that fund raising effort.

4

{01322265-1}

Also, I have spoken with August Klein several time in the last 6 months asking him to have John White close the Chase Bank account that has my name on it as it is frequently overdraw for long periods of time. No action was taken until after the action was filed.

**REQUEST FOR PRODUCTION NO. 7:**

Copies of all documents (whether emails, text messages, letters, or other communications) between you and Daniel White or Michael White concerning the Involuntary or the Debtor.

None were generated

Dated: June  3, 2019

Respectfully submitted,

Ronald E Earley
6429 Winding Tree Drive
New Carlisle, OH 45344

5

{01322265-1}

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF OHIO (DAYTON)

| | | |
|---|---|---|
| IN RE: | * | CASE NO. 19-30822 |
| TAGNETICS INC. | * | CHAPTER 7 |
| INVOLUNTARY DEBTOR | * | |

**RESPONSE TO INTERROGATORIES AND
REQUESTS FOR PRODUCTION OF DOCUMENTS**

FROM:     Jonathan Hager

**INTERROGATORIES**

**INTERROGATORY NO. 1:**

Please state the name, address and substance of the anticipated testimony of any witness

you may call at the trial of the Involuntary.

Witnesses I may call include:

Ronald E. Earley

6429 Winding Tree Dr.

New Carlisle, OH 45344


Kenneth W. Kayser

PO Box 115

Catawba, VA 24070

**INTERROGATORY NO. 2:**

Please state the name, address and substance of the anticipated testimony of any witness

who will testify in support of your claim against the Debtor.

1

{01322261-1}

Ronald E. Earley

6429 Winding Tree Dr.

New Carlisle, OH 45344


Kenneth W. Kayser

PO Box 115

Catawba, VA 24070


**INTERROGATORY NO. 3:**

Please state the amounts you assert are owed to you by the Debtor and what facts support

the amounts you claim you are owed.


Tagnetics owes Jonathan Hager $70,644.79 at the end of 2016. Tagnetics and Jonathan Hager

entered into an Employment, Non-Competition and Proprietary Rights Agreement on July 5,

2013 with an agreed Base Salary of $155,000 per annum. Copy of the executed agreement has

been provided. In 2013 and 2014 Tagnetics consistently paid at the agreed rate through standard

2-week payroll. In 2015, Tagnetics was unable to pay Jonathan Hager starting in September.

Tagnetics did provide some back pay (retro pay) when able but the gross payroll for the year was

$137,115.42 as indicated on the provided 2015 W-2 leaving an accrual for 2015 of $17,884.58.

Tagnetics was unable to consistently pay in 2016 resulting in gross pay of $102,239.79 as

indicated on the provided 2016 W-2 leaving an accrual for 2016 of $52,760.21.

2

Tagnetics did not issue a W-2 in 2017 or 2018. The term of Jonathan Hager's Employment Agreement with Tagnetics is one year but automatically renewed on July 5th each year unless terminated by the Employee or Company through written Notice not less than 30 days prior to expiration of a given annual term per Article II, Section 2.1. To date, no Notice has been provided by Tagnetics and no Notice has been submitted by the employee.

In September 2016, Tagnetics offered employees the option to receive compensation through common stock instead of cash through the First Amendment to Employment, Non-Competition and Proprietary Rights Agreement. Jonathan Hager had elected to receive common stock instead of cash but after one such payroll period Jonathan Hager submitted a request to return to cash payment or accrual. This notice was sent to the Company President, Ronald Earley as required In the First Amendment Agreement. Correspondence on December 8, 2016 with Lou Fernandez, acting CFO at the time, with copy to Ronald Earley, President, and John White, CEO, confirmed Tagnetics had only converted one payroll period, October 28, 2016, to stock and that all other payroll periods before and after were being accrued as cash. This is further evidenced by the 2016 W-2.

Since the Employment Agreement remains in full force due to automatic renewal, Tagnetics should have continued to accrue salary compensation in 2017 and 2018. Jonathan Hager had made requests for evidence of this accrual by attempting to contact Lou Fernandez by phone but did not receive a response. Jonathan Hager inquired about Company's status through conversations with Ronald Early by phone and Kenneth Kayser in person. In each conversation Ronald and Kenneth stated they had gotten positive outlooks from John White, CEO, suggesting

3

Tagnetics was entering a partnership or acquisition that would provide financial security for Tagnetics. I have not received any confirmation that one of these deals has been successful nor have I been provided any further update on the status of salary accrual or intent to pay. Contractually Tagnetics should have continued to accrue my salary and therefore would have accrued more than $400,000 in accrued salary.

In accordance with the Employment, Non-Competition and Proprietary Rights Agreement and considering the current status of Tagnetics, Jonathan Hager would like to offer two options for settlement of accrued payroll due to him.

Option 1: Jonathan Hager is requesting the payment of the accrued payroll from 2015 and 2016 and will accept Cessation of Compensation Without Cause on December 31, 2016 per the terms of Article II, Section 2.4 of the Employment, Non-Competition and Proprietary Rights Agreement. Per this section, Jonathan Hager is entitled to his base salary through this termination date, totaling $70,644.79 and 50% of the base salary, or $77,500 payable over 6 months with normal payroll practice. If Tagnetics is not running normal payroll practice, the entire sum is requested to be paid immediately totaling $148,144.79.

Option 2: Jonathan Hager will agree to terminate his Employment, Non-Competition and Proprietary Rights Agreement in writing as of July 4, 2017. Electing to terminate the agreement on that date will require Tagnetics to pay all accrued salary compensation to that date which will include the $70,644.79 accrued from 2015 and 2016 and an additional $77,500 for accrued payroll through July 4, 2017. This would make the total sum payable to be $148,144.79.

4

{01322261-1}

**INTERROGATORY NO. 4:**

Please state the name, address and substance of the anticipated testimony of any witness who will testify in support of your assertion that the Debtor is not paying its debts as they come due.

Ronald E. Earley, 6429 Winding Tree Dr., New Carlisle, OH 45344, John White, Compass Marketing, Inc. and Lou Fernandez (current address not known) have been copied on multiple email correspondence from vendors that have been requesting payment of past due invoices. Copies of the email correspondence have been provided. Correspondence shows a trend beginning in 2014 where Tagnetics was not paying outstanding invoices in a timely manner. In November of 2014, Amtech of San Jose, CA, a vendor for Tagnetics, requested payment status for invoices that were more than 6 months overdue. In November of 2015, Pervasive Displays of Taiwan, was requesting an update on past due amounts. These requests continued through correspondence in May of 2016 and September of 2016. American Standard Circuits, a vendor for Tagnetics, requested an update for payment of past due invoices in October 2016. A list of the invoices has been provided. MET Labs, a vendor for Tagnetics, repeatedly contacted Tagnetics about past due invoices. Copies of that correspondence for January 2017, April 2017, August 2017 and October 2017 have been provided with evidence of copy to Lou Fernandez, Ronald Earley and John White. I am not aware whether these debts are still outstanding since I do not have visibility to Tagnetics records. I provided each of these vendors with Tagnetics management contact information since I was not able to provide any insight into the plan for reconciling these accounts.

5

**INTERROGATORY NO. 5:**

Please state why you filed the Involuntary action against the Debtor, as opposed to filing suit and obtaining a monetary judgment against the Debtor in state or federal court.

I elected to join in the Involuntary Action against the Debtor since previous updates about the status of Tagnetics from Ronald Earley and Kenneth Kayser were not appearing promising. I had heard that both gentlemen had resigned from their positions on the Board of Directors. Multiple optimistic outlooks about promising partnerships or acquisitions did not come to fruition. Anticipating the financial status of Tagnetics to continue to decline I agreed with the petitioning parties that the Involuntary action require Tagnetics to respond and act on accrued salary. The group Involuntary action appeared to be a stronger position indicating Tagnetics disregard for Employment Agreements and their responsibility to the debt that needed to be addressed in its entirety instead of on an individual basis.

**INTERROGATORY NO. 6:**

Identify and describe each communication you had with Daniel White or Michael White regarding the Involuntary and/or the Debtor.

I met Daniel White and Michael White one time each in Annapolis Maryland at the offices of John White and Compass Marketing Inc. I believe I met Michael White in passing in the office with no further conversation and no subsequent correspondence. I met Daniel White when we were having a vendor meeting in the Compass Marketing offices with one potential contract

6

manufacturer, Foxconn. I do not recall the date of this meeting. I have not had any subsequent

correspondence with Daniel White.

## IV. PRODUCTION OF DOCUMENTS

### REQUEST FOR PRODUCTION NO. 1:

Copies of all documents that form the basis for your claim against the Debtor.

Documents provided include:

W-2s for Jonathan Hager for 2013, 2014, 2015, 2016.

Tagnetics Employment, Non-competition and Proprietary Rights Agreement for Jonathan Hager

Employee Contract Amendment Change request email

Stock for Services Cancellation email

Stock Compensation Cancellation Letter 120916

Tagnetics – Compensation Confirmation


### REQUEST FOR PRODUCTION NO. 2:

Copies of all correspondence wherein you made a demand on the Debtor for the payment

of the amount you assert you are owed by the Debtor.

Documents Include:

Tagnetics – Compensation Confirmation

Other demands were made through correspondence discussed in Request for Production No. 6.


### REQUEST FOR PRODUCTION NO. 3:

Copies of all documents that were used or reviewed by you in the calculation of all

claims asserted by you against the Debtor.

7

{01322261-1}

Same documents that were listed for Request for Production No. 1.


**REQUEST FOR PRODUCTION NO. 4:**

Copies of all documents used or reviewed that support your assertion that the Debtor is

not paying its debts as they become due.

Documents Include:

Amtech Overdue Notice 2014 email

ASC Past Due Oct 2016 email

Report from American Standard Circuits

MET Labs Past Due emails Jan 2017, April 2017, Aug 2017, Oct 2017

Pervasive Past Due Nov 2015, May 2016, Sep 2016


**REQUEST FOR PRODUCTION NO. 5:**

Copies of all correspondence sent to or received from any other Petitioning Creditor.

Correspondence was by telephone without any documentation.

**REQUEST FOR PRODUCTION NO. 6:**

Copies of all correspondence with any board member or officer of the Debtor that refers

to or relates to or discusses your claim against the Debtor.

All correspondence regarding status of my past due accrued salary has been with Ronald Earley

and Kenneth Kayser since I reported directly to them and they were Officers and Members of the

Board of Directors were by telephone and therefore there are no documented records. I received

updates about teaming agreements with Tyco, Hitachi, Walgreens, Johnson and Johnson,

Microsoft, Qualcomm and Oracle. Each phone call we discussed the status of employment and

8

whether past salary would be paid. In each case they had been assured by John White, the CEO, that the next deal would make the Tagnetics solvent and to be patient. I continued to believe Tagnetics had a great product and was hopeful for success until another year passed without any successful deals in place.

**REQUEST FOR PRODUCTION NO. 7:**

Copies of all documents (whether emails, text messages, letters, or other communications) between you and Daniel White or Michael White concerning the Involuntary or the Debtor.

No documents for this request have been provided because no document exists.

Dated: May 31, 2019

Respectfully submitted.

_____

**Jonathan Hager**
2170 River Oaks Drive
Salem, VA 24153

9

{01322261-1}

# EXHIBIT 4

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF OHIO (DAYTON)

| | | |
|---|---|---|
| IN RE: | * | CASE NO. 19-30822 |
| TAGNETICS INC. | * | CHAPTER 7 |
| INVOLUNTARY DEBTOR | * | |

**RESPONSES TO INTERROGATORIES AND
REQUESTS FOR PRODUCTION OF DOCUMENTS**

FROM:    Robert Strain

**.  INTERROGATORIES**

**INTERROGATORY NO. 1:**

Please state the name, address and substance of the anticipated testimony of any witness

you may call at the trial of the Involuntary.

Lou Fernandez 4437 Stonehaven Dr. Long Grove, IL 60047 Former CFO Tagnetics

Ron Earley 6429 Winding Tree Dr. New Carlisle, OH 45344 Former President Tagnetics

**INTERROGATORY NO. 2:**

Please state the name, address and substance of the anticipated testimony of any witness

who will testify in support of your claim against the Debtor.

Same As Above

**INTERROGATORY NO. 3:**

Please state the amounts you assert are owed to you by the Debtor and what facts support

the amounts you claim you are owed.

$17,049.35 W-2 Statements from 2014 to 2017. Deferred Payroll Spreadsheet

1

{01322263-1}

**INTERROGATORY NO. 4:**

Please state the name, address and substance of the anticipated testimony of any witness

who will testify in support of your assertion that the Debtor is not paying its debts as they come

due.

**INTERROGATORY NO. 5:**

Please state why you filed the Involuntary action against the Debtor, as opposed to filing

suit and obtaining a monetary judgment against the Debtor in state or federal court.

Did not have the financial means to file a lawsuit.

**INTERROGATORY NO. 6:**

Identify and describe each communication you had with Daniel White or Michael White

regarding the Involuntary and/or the Debtor.

No communication.

## PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1:**

Copies of all documents that form the basis for your claim against the Debtor.

See attached documents.

**REQUEST FOR PRODUCTION NO. 2:**

Copies of all correspondence wherein you made a demand on the Debtor for the payment

of the amount you assert you are owed by the Debtor.

See attached documents

**REQUEST FOR PRODUCTION NO. 3:**

Copies of all documents that were used or reviewed by you in the calculation of all

claims asserted by you against the Debtor.

See attached documents.

2

**REQUEST FOR PRODUCTION NO. 4:**

Copies of all documents used or reviewed that support your assertion that the Debtor is

not paying its debts as they become due.

See attached vendor / landlord emails

**REQUEST FOR PRODUCTION NO. 5:**

Copies of all correspondence sent to or received from any other Petitioning Creditor.

None

**REQUEST FOR PRODUCTION NO. 6:**

Copies of all correspondence with any board member or officer of the Debtor that refers

to or relates to or discusses your claim against the Debtor.

None

**REQUEST FOR PRODUCTION NO. 7:**

Copies of all documents (whether emails, text messages, letters, or other

communications) between you and Daniel White or Michael White concerning the Involuntary

or the Debtor.

None

Dated: May 16, 2019

Respectfully submitted.

_____

**Robert Strain**
427 Artell St
Marcengo, IL 60152

3

{01322263-1}



**Transaction Details**
Prepared for
John D White
Account Number
XXXX-XXXXXX-71008

| Classic Blue Cash® / June 3, 2017 to June 3, 2019 |
| Search results for "Intuit " |

| Date | Receipt | Description | Card Member | Amount |
|------|---------|-------------|-------------|--------|
| Jun 19 2017 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $15.00 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: SOFTWARE
Reference: 32017170036466917
Category: Merchandise & Supplies-Computer Supplies

| Jul 19 2017 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $15.00 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: SOFTWARE
Reference: 320172010834816560
Category: Merchandise & Supplies-Computer Supplies

| Aug 19 2017 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $15.00 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: SOFTWARE
Reference: 320172310286091649
Category: Merchandise & Supplies-Computer Supplies

| Sep 19 2017 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $15.00 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: SOFTWARE
Reference: 320172620743253648
Category: Merchandise & Supplies-Computer Supplies

| Oct 08 2017 | | INTUIT *QB ONLINE - 800-286-6800, CA | Michael R White | $430.00 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: SOFTWARE
Reference: 320172820048048128
Category: Merchandise & Supplies-Computer Supplies

| Oct 19 2017 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $17.50 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: SOFTWARE
Reference: 320172920196055620
Category: Merchandise & Supplies-Computer Supplies

| Nov 07 2017 | | INTUIT *TURBOTAX - 800-446-8848, CA | Daniel White | $159.99 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: SOFTWARE
Reference: 320173120508075208
Category: Merchandise & Supplies-Computer Supplies

| Nov 19 2017 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $17.50 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: SOFTWARE
Reference: 320173230669519882
Category: Merchandise & Supplies-Computer Supplies

| Dec 13 2017 | | INTUIT *PROSERIES - 800-446-8848, CA | Daniel White | $579.82 |

Doing Business As: INTUIT
2700 COAST AVE MOUNTAIN VIEW CA 94043-1140 UNITED STATES
Additional Information: IGS_110239430598 92129
Reference: 320173480087734342
Category: Merchandise & Supplies-Computer Supplies

 **Transaction Details**
Prepared for
John D White
Account Number
XXXX-XXXXXX-71008

Classic Blue Cash® / June 3, 2017 to June 3, 2019
Search results for "Intuit "

| Date | Receipt | Description | Card Member | Amount |
|------|---------|-------------|-------------|--------|
| Dec 19 2017 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $17.50 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: SOFTWARE
Reference: 320173530173987378
Category: Merchandise & Supplies-Computer Supplies

| Jan 10 2018 | | INTUIT *PROCONNECTTAX - 800-446-8848, CA | Daniel White | $571.20 |

Doing Business As: INTUIT
2700 COAST AVE MOUNTAIN VIEW CA 94043-1140 UNITED STATES
Additional Information: IGS_110240967728 92129
Reference: 320180110520553993
Category: Merchandise & Supplies-Computer Supplies

| Jan 19 2018 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $17.50 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: SOFTWARE
Reference: 320180190636335471
Category: Merchandise & Supplies-Computer Supplies

| Jan 23 2018 | | GOOGLE *INTUIT INC - 855-836-3987, CA | Daniel White | $16.99 |

Doing Business As: Google Services
1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES
Additional Information: SELLER
Reference: 320180240717112792
Category: Business Services-Internet Services

| Feb 06 2018 | | INTUIT *CHECKS / FORMS - 800-446-8848, CA | Michael R White | $438.77 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: SOFTWARE
Reference: 320180440013936218
Category: Merchandise & Supplies-Computer Supplies

| Feb 19 2018 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $17.50 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: SOFTWARE
Reference: 320180500106924486
Category: Merchandise & Supplies-Computer Supplies

| Feb 22 2018 | | GOOGLE *INTUIT INC - 855-836-3987, CA | Daniel White | $16.99 |

Doing Business As: Google Services
1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES
Additional Information: SELLER
Reference: 320180550197286927
Category: Business Services-Internet Services

| Mar 07 2018 | | INTUIT PAYROLL - 888-537-7794, CA | Michael R White | $22.97 |

Doing Business As: PAYCYCLE
210 PORTAGE AVE PALO ALTO CA 94306-2242 UNITED STATES
Additional Information: PAYROLL SVC
Reference: 320180660356780158
Category: Merchandise & Supplies-Internet Purchase

| Mar 19 2018 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $17.50 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: 214569404 21403-
Reference: 320180780548583460
Category: Merchandise & Supplies-Computer Supplies



**Transaction Details**
Prepared for
**John D White**
Account Number
**XXXX-XXXXXX-71008**

Classic Blue Cash® / June 3, 2017 to June 3, 2019
Search results for "Intuit "

| Date | Receipt | Description | Card Member | Amount |
|---|---|---|---|---|
| Mar 22 2018 | | GOOGLE *INTUIT INC - 855-836-3987, CA | Daniel White | $16.99 |

Doing Business As: Google Services
1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES
Additional Information: SELLER
Reference: 320180830634702054
Category: Business Services-Internet Services

| | | | | |
|---|---|---|---|---|
| Apr 18 2018 | | INTUIT *TURBOTAX - 800-446-8848, CA | Daniel White | $59.99 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: 632707185 21403-
Reference: 320181080018631437
Category: Merchandise & Supplies-Computer Supplies

| | | | | |
|---|---|---|---|---|
| Apr 19 2018 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $17.50 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: 216289554 21403-
Reference: 320181090036705115
Category: Merchandise & Supplies-Computer Supplies

| | | | | |
|---|---|---|---|---|
| Apr 22 2018 | | GOOGLE *INTUIT INC - 855-836-3987, CA | Daniel White | $16.99 |

Doing Business As: Google Services
1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES
Additional Information: SELLER
Reference: 320181140126925726
Category: Business Services-Internet Services

| | | | | |
|---|---|---|---|---|
| May 19 2018 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $17.50 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: 217743125 21403-
Reference: 320181390521200541
Category: Merchandise & Supplies-Computer Supplies

| | | | | |
|---|---|---|---|---|
| May 22 2018 | | GOOGLE *INTUIT INC - 855-836-3987, CA | Daniel White | $16.99 |

Doing Business As: Google Services
1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES
Additional Information: SELLER
Reference: 320181440603347376
Category: Business Services-Internet Services

| | | | | |
|---|---|---|---|---|
| Jun 19 2018 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $17.50 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: 219211720 21403-
Reference: 320181700011652432
Category: Merchandise & Supplies-Computer Supplies

| | | | | |
|---|---|---|---|---|
| Jun 22 2018 | | GOOGLE *INTUIT INC - 855-836-3987, CA | Daniel White | $16.99 |

Doing Business As: Google Services
1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES
Additional Information: SELLER
Reference: 320181740078428337
Category: Business Services-Internet Services

| | | | | |
|---|---|---|---|---|
| Jul 19 2018 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $17.50 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: 220642986 21403-
Reference: 320182000489839980
Category: Merchandise & Supplies-Computer Supplies



**Transaction Details**
Prepared for
John D White
Account Number
XXXX-XXXXXXX-71008

Classic Blue Cash® / June 3, 2017 to June 3, 2019
Search results for "Intuit "

| Date | Receipt | Description | Card Member | Amount |
|------|---------|-------------|-------------|--------|
| Jul 22 2018 | | GOOGLE *INTUIT INC - 855-836-3987, CA | Daniel White | $16.99 |

Doing Business As: Google Services
1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES
Additional Information: SELLER
Reference: 320182040555874234
Category: Business Services-Internet Services

| Aug 19 2018 | | INTUIT *QB ONLINE - 800-286-6800 CA | Daniel White | $17.50 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: 222098739 21403-
Reference: 320182310989236890
Category: Merchandise & Supplies-Computer Supplies

| Aug 22 2018 | | GOOGLE *INTUIT INC - 855-836-3987, CA | Daniel White | $16.99 |

Doing Business As: Google Services
1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES
Additional Information: SELLER
Reference: 320182350054819770
Category: Business Services-Internet Services

| Sep 19 2018 | | INTUIT *QB ONLINE - 800-286-6800, CA | Daniel White | $17.50 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: 223614939 21403-
Reference: 320182630505481386
Category: Merchandise & Supplies-Computer Supplies

| Sep 22 2018 | | GOOGLE *INTUIT INC - 855-836-3987, CA | Daniel White | $16.99 |

Doing Business As: Google Services
1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES
Additional Information: SELLER
Reference: 320182660548631788
Category: Business Services-Internet Services

| Oct 08 2018 | | INTUIT *QB ONLINE - 800-286-6800, CA | Michael R White | $845.00 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: 224520097 21403-
Reference: 320182820613032414
Category: Merchandise & Supplies-Computer Supplies

| Oct 16 2018 | | INTUIT *TURBOTAX - 800-446-8848, CA | Daniel White | $74.99 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: 634321813 21403-
Reference: 320182890927680592
Category: Merchandise & Supplies-Computer Supplies

| Oct 22 2018 | | GOOGLE *INTUIT INC - 855-836-3987, CA | Daniel White | $16.99 |

Doing Business As: Google Services
1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES
Additional Information: SELLER
Reference: 320182960036233037
Category: Business Services-Internet Services

| Oct 23 2018 | | INTUIT *QUICKBOOKS - 800-446-8848, CA | Daniel White | $17.50 |

Doing Business As: INTUIT QUICKBOOKS
2535 GARCIA AVE MOUNTAIN VIEW CA 94043 UNITED STATES
Additional Information: FINANCESOFTW
Reference: 320182980041409006
Category: Merchandise & Supplies-Computer Supplies



**Transaction Details**
Prepared for
John D White
Account Number
XXXX-XXXXXX-71008

| Classic Blue Cash® / June 3, 2017 to June 3, 2019 |
| Search results for "Intuit " |

| Date | Receipt | Description | Card Member | Amount |
|------|---------|-------------|-------------|--------|
| Nov 08 2018 | | INTUIT *TURBOTAX - 800-446-8848, CA | Daniel White | $159.99 |
| Doing Business As: INTUIT | | | | |
| 7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES | | | | |
| Additional Information: 225947981 21403- | | | | |
| Reference: 320183130318842297 | | | | |
| Category: Merchandise & Supplies-Computer Supplies | | | | |
| Nov 19 2018 | | INTUIT *QUICKBOOKS - 800-446-8848, CA | Daniel White | $17.50 |
| Doing Business As: INTUIT QUICKBOOKS | | | | |
| 2535 GARCIA AVE MOUNTAIN VIEW CA 94043 UNITED STATES | | | | |
| Additional Information: FINANCESOFTW | | | | |
| Reference: 320183230490550496 | | | | |
| Category: Merchandise & Supplies-Computer Supplies | | | | |
| Nov 23 2018 | | GOOGLE *INTUIT INC - 855-836-3987, CA | Daniel White | $16.99 |
| Doing Business As: Google Services | | | | |
| 1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES | | | | |
| Additional Information: SELLER | | | | |
| Reference: 320183270553782218 | | | | |
| Category: Business Services-Internet Services | | | | |
| Dec 19 2018 | | INTUIT *QUICKBOOKS - 800-446-8848, CA | Daniel White | $17.50 |
| Doing Business As: INTUIT QUICKBOOKS | | | | |
| 2535 GARCIA AVE MOUNTAIN VIEW CA 94043 UNITED STATES | | | | |
| Additional Information: FINANCESOFTW | | | | |
| Reference: 320183530029075776 | | | | |
| Category: Merchandise & Supplies-Computer Supplies | | | | |
| Dec 23 2018 | | GOOGLE *INTUIT INC - 855-836-3987, CA | Daniel White | $16.99 |
| Doing Business As: Google Services | | | | |
| 1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES | | | | |
| Additional Information: SELLER | | | | |
| Reference: 320183570098037903 | | | | |
| Category: Business Services-Internet Services | | | | |
| Jan 08 2019 | | INTUIT *PROCONNECTTAX - 800-446-8848, CA | Daniel White | $486.90 |
| Doing Business As: INTUIT | | | | |
| 2700 COAST AVE MOUNTAIN VIEW CA 94043-1140 UNITED STATES | | | | |
| Additional Information: IGS_110261680134 92129 | | | | |
| Reference: 320190090359182224 | | | | |
| Category: Merchandise & Supplies-Computer Supplies | | | | |
| Jan 08 2019 | | INTUIT *PROCONNECTTAX - 800-446-8848, CA | Daniel White | $561.70 |
| Doing Business As: INTUIT | | | | |
| 2700 COAST AVE MOUNTAIN VIEW CA 94043-1140 UNITED STATES | | | | |
| Additional Information: IGS_110261684091 92129 | | | | |
| Reference: 320190090358765461 | | | | |
| Category: Merchandise & Supplies-Computer Supplies | | | | |
| Jan 19 2019 | | INTUIT *QUICKBOOKS - 800-446-8848, CA | Daniel White | $17.50 |
| Doing Business As: INTUIT QUICKBOOKS | | | | |
| 2535 GARCIA AVE MOUNTAIN VIEW CA 94043 UNITED STATES | | | | |
| Additional Information: FINANCESOFTW | | | | |
| Reference: 320190190526759894 | | | | |
| Category: Merchandise & Supplies-Computer Supplies | | | | |
| Jan 22 2019 | | GOOGLE *INTUIT INC - 855-836-3987, CA | Daniel White | $16.99 |
| Doing Business As: Google Services | | | | |
| 1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES | | | | |
| Additional Information: SELLER | | | | |
| Reference: 320190230580307165 | | | | |
| Category: Business Services-Internet Services | | | | |



**Transaction Details**
Prepared for
John D White
Account Number
XXXX-XXXXXX-71008

Classic Blue Cash® / June 3, 2017 to June 3, 2019
Search results for "Intuit "

| Date | Receipt | Description | Card Member | Amount |
|------|---------|-------------|-------------|--------|
| Jan 28 2019 | | INTUIT PAYROLL - 888-537-7794, CA | Michael R White | $18.98 |

Doing Business As: PAYCYCLE
210 PORTAGE AVE PALO ALTO CA 94306-2242 UNITED STATES
Additional Information: PAYROLL SVC
Reference: 320190280657041417
Category: Merchandise & Supplies-Internet Purchase

| Feb 19 2019 | | INTUIT *QUICKBOOKS - 800-446-8848, CA | Daniel White | $17.50 |

Doing Business As: INTUIT QUICKBOOKS
2535 GARCIA AVE MOUNTAIN VIEW CA 94043 UNITED STATES
Additional Information: FINANCESOFTW
Reference: 320190500021489776
Category: Merchandise & Supplies-Computer Supplies

| Feb 22 2019 | | GOOGLE *INTUIT INC - 855-636-3987, CA | Daniel White | $16.99 |

Doing Business As: Google Services
1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES
Additional Information: SELLER
Reference: 320190540083635640
Category: Business Services-Internet Services

| Feb 26 2019 | | INTUIT *CHECKS / FORMS - 800-446-8848, CA | Michael R White | $12.39 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: 232444029 21403-
Reference: 320190600182793692
Category: Merchandise & Supplies-Computer Supplies

| Feb 26 2019 | | INTUIT PAYROLL - 888-537-7794, CA | Michael R White | $3.99 |

Doing Business As: PAYCYCLE
210 PORTAGE AVE PALO ALTO CA 94306-2242 UNITED STATES
Additional Information: PAYROLL SVC
Reference: 320190570128742759
Category: Merchandise & Supplies-Internet Purchase

| Mar 06 2019 | | INTUIT *CHECKS / FORMS - 800-446-8848, CA | Michael R White | $438.04 |

Doing Business As: INTUIT
7535 TORREY SANTA FE RD SAN DIEGO CA 92129 UNITED STATES
Additional Information: 232444029 21403-
Reference: 320190650264842199
Category: Merchandise & Supplies-Computer Supplies

| Mar 19 2019 | | INTUIT *QUICKBOOKS - 800-446-8848, CA | Daniel White | $17.50 |

Doing Business As: INTUIT QUICKBOOKS
2535 GARCIA AVE MOUNTAIN VIEW CA 94043 UNITED STATES
Additional Information: FINANCESOFTW
Reference: 320190780488885365
Category: Merchandise & Supplies-Computer Supplies

| Mar 22 2019 | | GOOGLE *INTUIT INC - 855-636-3987, CA | Daniel White | $16.99 |

Doing Business As: Google Services
1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES
Additional Information: SELLER
Reference: 320190820550146616
Category: Business Services-Internet Services

| Apr 19 2019 | | INTUIT *QUICKBOOKS - 800-446-8848, CA | Daniel White | $17.50 |

Doing Business As: INTUIT QUICKBOOKS
2535 GARCIA AVE MOUNTAIN VIEW CA 94043 UNITED STATES
Additional Information: FINANCESOFTW
Reference: 320191090014310379
Category: Merchandise & Supplies-Computer Supplies



**Transaction Details**
Prepared for
John D White
Account Number
XXXX-XXXXXX-71008

| Classic Blue Cash® / June 3, 2017 to June 3, 2019 |
| Search results for "Intuit " |

| Date | Receipt | Description | Card Member | Amount |
|------|---------|-------------|-------------|--------|
| Apr 22 2019 | | GOOGLE *INTUIT INC - 855-836-3987, CA | Daniel White | $16.99 |

Doing Business As: Google Services
1600 AMPHITHEATRE PKWY MOUNTAIN VIEW CA 94043-1351 UNITED STATES
Additional Information: SELLER
Reference: 320191130074999950
Category: Business Services-Internet Services

## SUMMARY

| | |
|------|------|
| Payments | $0.00 |
| Charges | $5,329.06 |
| Credits | $0.00 |
| Total | $5,329.06 |

# EXHIBIT 5

## EMPLOYMENT, NON-COMPETITION
## AND PROPRIETARY RIGHTS AGREEMENT

THIS EMPLOYMENT NON-COMPETITION AND PROPRIETARY RIGHTS AGREEMENT (the "Agreement") is effective as of the 21st day of June, 2012, by and between TAGNETICS, INC., a Delaware corporation (the "Company"), and KENNETH W. KAYSER (the "Employee").

## RECITALS:

A.    The Company is engaged in the manufacture and sale of electronic shelf tag systems and related products and services.

B.    The Company desires to employ the Employee and Employee desires to be employed by the Company as its Chief Technical Officer, subject to the terms, conditions and covenants hereinafter set forth; and

C.    As a condition of the Company employing the Employee, Employee has agreed not to divulge to the public the Company's confidential information, not to solicit the Company's vendors, customers or employees and not to compete with the Company, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the agreements, covenants and conditions set forth herein, the Employee and the Company hereby agree as follows:

## ARTICLE I
## EMPLOYMENT

1.1    Employment. The Company hereby employs, engages and hires Employee, and Employee hereby accepts employment, upon the terms and conditions set forth in this Agreement. Employee is employed as the Company's Senior Vice President & Chief Technical Officer and reports directly to the President & Chief Operating Officer of the Company. The Senior Vice President & Chief Technical Officer is an Executive Officer of the Company. The duties of the Senior Vice President & Chief Technical Officer shall be those customary for such position.

1.2    Activities and Duties During Employment. Employee represents and warrants to the Company that Employee is free to accept employment with the Company and that Employee has no prior or other commitments or obligations of any kind to anyone else which would hinder or interfere with the acceptance and performance of the obligations under this Agreement.

Employee accepts the employment described in Article I of this Agreement and agrees to devote his full time and efforts to the faithful and diligent performance of the services described herein, including the performance of such other services and responsibilities as the Company may, from time to time, stipulate. Notwithstanding the foregoing, Employee may: (i) serve on the board of directors of other entities or serve in any capacity with any hobby, avocation, civic, educational, religious, professional or charitable activity or organization provided that such service does not materially interfere or conflict with his duties hereunder; (ii) make and manage personal investments of his choice;; and (iii) pursue other business activities provided that such activities do not materially interfere or conflict with his duties hereunder. Employee shall

comply with and be bound by the Company's operating policies, procedures and practices in effect from time to time during the terms of his employment.

1.3    Funding of Activities and Duties During Employment.  Company represents that it will make good faith efforts to adequately budget for and fund the activities and investments necessary for Employee to execute the activities and duties of his employment with the Company.    Notwithstanding the foregoing, the Employee will be subject to the standard budgeting practices of the Company and the Company's other policies and procedures including, but not limited to the Company's current and future policies and procedures related to delegation of authority.

1.4    Scheduled Work Week.  Employee's work shall be performed from such locations and at such times as mutually agreed and proper to meet his responsibilities, subject to the day to day direction from the President & Chief Operating Officer of the Company.

## ARTICLE II
## TERM

2.1    Term.  The term of employment under this Agreement shall be two (2) years, commencing as of the date of the Agreement (such term of employment, as it may be extended or terminated, is herein referred to as the "Employment Term"), which Employment Term shall automatically renew for additional one (1) year periods unless terminated by Employee or the Company by written notice not less than thirty (30) days prior to expiration of the then-current term.

2.2    Termination.  The Employment Term and Employment of Employee may be terminated as follows:

(a)    Automatically, without the action of either party, upon the death of the Employee.

(b)    By either party upon the Total Disability of the Employee.  The Employee shall be considered to have a Total Disability for purposes of this Agreement if he is unable, by reason of accident or illness or mental disability, to substantially perform his employment duties for a period of three (3) months during any period of twelve (12) consecutive months.  The determination of whether a Total Disability has occurred shall be based on the determination of a physician selected by the Company.  Nothing herein shall limit the Employee's right to receive any payments to which Employee may be entitled under any disability or employee benefit plan of the Company or under any disability or insurance policy or plan.  During a period of Total Disability prior to termination hereunder, Employee shall continue to receive his full compensation (including base salary and bonus) and benefits.

(c)    By the Employee upon thirty (30) days' written notice to the Company.

(d)    Automatically, without the action of either party, upon expiration of the Employment Term.

(e)    By the Company "Without Cause," and without notice which shall mean a termination of the Employee's employment by the Company other than pursuant to the

2

provisions of <u>Section 2.2(a)</u>, <u>Section 2.2(b)</u> and <u>Section 2.2(f)</u> hereof. Any termination of Employee which occurs within one year following a "Change in Control" of Company shall be deemed a termination Without Cause. For purposes of this Agreement, a "Change in Control" occurs when there is: (a) a sale of substantially all of the assets of the Company; (b) a replacement of a majority of the existing directors of the Company; (c) any person or entity that is not a shareholder of the Company as of the date of this Agreement, becomes the beneficial owner, directly or indirectly, of securities of the Company representing more than fifty percent (50%) of the Company's outstanding securities; (d) the approval of a merger, sale or consolidation of the Company with any other company, other than a merger or consolidation which would result in the voting securities of Company outstanding immediately prior thereto continuing to represent more than fifty percent (50%) of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger consolidation; or (e) the shareholders and/or board of directors of the Company approve a plan of liquidation, dissolution or winding up of the Company.

      (f)    By the Company for "Cause" (as defined below).

    2.3    <u>Cessation of Rights and Obligations: Survival of Certain Provisions</u>. On the date of expiration or earlier termination of the Employment Term for any reason, all of the respective rights, duties, obligations and covenants of the parties, as set forth herein, shall except as specifically provided herein to the contrary, cease and become of no further force or effect as of the date of said termination, and shall only survive as expressly provided for herein.

    2.4    <u>Cessation of Compensation</u>. In lieu of any severance under any severance plan that the Company may then have in effect, and subject to: (i) the receipt of a full and unconditional release from Employee; and (ii) any amounts owed by the Employee to the Company under any contract, agreement or loan document entered into after the date hereof (including, but not limited to, loans made by the Company to the Employee), the Company shall pay to the Employee, and the Employee shall be entitled to receive, the following amounts within thirty (30) days of the date of termination of his employment in full satisfaction of any obligation to Employee for termination of this Agreement:

      (a)    <u>Voluntary Termination/Termination For Cause</u>. Upon: (i) termination of the Employee's employment pursuant to <u>Sections 2.2(c) or (f)</u>; or (ii) the expiration of the Employment Term pursuant to <u>Section 2.2(d)</u>, because the Employee elects not to extend the Employment Term, Employee shall be entitled to receive his base salary, bonus, benefits and expense reimbursements solely through the date of termination.

      (b)    <u>Death/Total Disability</u>. Upon the termination of the Employment Term by reason of the death or Total Disability of the Employee, pursuant to <u>Sections 2.2(a) or (b)</u>, the Employee (or, in the case of death, his estate) shall be entitled to receive his base salary through the date of death or determination of Total Disability plus twelve (12) months, which shall include any of his unused vacation pay and unpaid bonus (if any) (subject to applicable withholding tax) based on the percentage of the calendar year through the date of termination of employment, multiplied by the bonus earned by the Employee in the immediately preceding calendar year.

      (c)    <u>Without Cause</u>. If Employee's employment is terminated Without Cause, pursuant to <u>Section 2.2(e)</u>, Employee will be entitled to receive: (i) his base salary

3

through the date of termination; plus (ii) twelve months' additional base salary (payable over the next twelve months consistent with normal payroll practice; plus (iii) any of his unused vacation pay; plus (iv) and unpaid bonus (if any) (subject to applicable withholding tax) based on the percentage of the calendar year through the date of termination of employment, multiplied by the bonus earned by the Employee in the immediately preceding calendar year.

Provided that Employee makes a timely election to continue coverage under the Company's group health plans pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), health insurance benefits with the same coverage (subject to Company's right to change coverage as set forth in the last sentence of this Section) provided to Employee prior to the termination (e.g. medical, dental, optical, mental health) will be provided at the Company's cost for eighteen (18) months following the termination date, but not longer than until Employee is covered by comparable health insurance benefits from another employer or is otherwise ineligible for COBRA continuation coverage. Nothing contained herein shall restrict the ability of the Company or its successor from changing some or all of the terms of such health insurance benefits, the cost to participants or other features of such benefits; provided, however, that all similarly situated participants are treated the same.

2.5    Business Expenses.

(a)    Reimbursement.   The Company shall reimburse the Employee for all reasonable, ordinary, and necessary business expenses incurred by him in connection with the performance of his duties hereunder, including, but not limited to, ordinary and necessary travel expenses and entertainment expenses. The reimbursement of business expenses will be governed by the policies for the Company and the terms otherwise set forth herein.

(b)    Accounting.   The Employee shall provide the Company with an accounting of his expenses, which accounting shall clearly reflect which expenses are incurred for proper business purposes in accordance with the policies adopted by the Company and as such are reimbursable by the Company. The Employee shall provide the Company with such other supporting documentation and other substantiation of reimbursable expenses as will conform to Internal Revenue Service or other requirements.   All such reimbursements shall be payable by the Company to the Employee within a reasonable time after receipt by the Company of appropriate documentation therefore.

2.6    Cause. For purposes of this Agreement, "Cause" for Employee's termination will exist if the Company terminates Employee's employment for any of the following reasons: (i) Employee willfully fails to substantially perform his duties hereunder (other than any such failure due to his physical or mental illness), and such willful failure is not remedied within ten (10) business days after written notice from the Company's board of directors, which written notice shall state that failure to remedy such conduct may results in an involuntary termination for Cause; (ii) Employee engages in willful and serious misconduct (including, but not limited to, an act of fraud or embezzlement) that has caused or is reasonably expected to result in material injury to the Company or any of its Affiliates; (iii) Employee is convicted of or enters a plea of guilty or nolo contendere to a: (A) crime that materially adversely affects his ability to perform his duties on behalf of the Company; or (B) felony; or (iv) Employee engages in alcohol or substance abuse which adversely affects his ability to perform his duties.

4

# ARTICLE III
## COMPENSATION AND BENEFITS

3.1    <u>Compensation</u>.    During Employee's employment, the Company shall pay Employee such salary, bonus and other benefits and awards as set forth on <u>Exhibit A</u>.    The Company and Employee mutually acknowledge that, based on the background, experience and credentials of the Employee, the initial compensation set forth in Exhibit A is not representative of the fair market compensation that might otherwise be available to the Employee from other potential employers.  Accordingly, the Company will, at the sole discretion of the Board of Directors, consider good faith adjustments to the nature, timing and amount of the Employee's compensation as the financial performance of the Company allows.

3.2    <u>Payment</u>. Except as otherwise provided herein, all compensation shall be payable in intervals in accordance with the general payroll payment practice of the Company.  The compensation shall be subject to such withholdings and deductions by the Company as are required by law.

3.3    <u>Vacation</u>.  The Employee shall be entitled to receive 160 hours of personal time off ("PTO") each year of the Employment Term beginning on the date hereof and continuing with each one year extension of the Employment Term; any PTO time not taken during each year of the Employment Term shall carry over to the next year, subject to a maximum aggregate carryover of 80 hours of PTO.

3.4    <u>Other Benefits</u>.  Employee shall be entitled to participate in any retirement, pension, profit-sharing, stock option, health plan, insurance, disability income, incentive compensation and welfare or any other benefit plan or plans of the Company which may now or hereafter be in effect and for which the Employee is eligible or for which all senior executives in general are eligible.  Notwithstanding the forgoing, the Company shall be under no obligation to institute or continue the existence of any such benefit plan.

# ARTICLE IV
## CONFIDENTIALITY, NON-SOLICITATION, NON-COMPETE
## AND QUIT CLAIM AGREEMENT

4.1    <u>Non-Disclosure of Confidential Information</u>.  Employee hereby acknowledges and agrees that, as of a result of the employment hereunder, Employee will acquire, develop, and use information that is not generally known to the public or to the Company's industry, including but not limited to, certain records, phone locations, documentation, software programs, price lists, customer lists, contract prices for the Company's services, business plans and prospects of the Company, equipment configurations, ledgers and general information, employee records, mailing lists, manufacturing techniques, product formulations, accounts receivable and payable ledgers, financial and other records of the Company or its affiliates, and other similar matters, as well as any information disclosed to the Company by any third party under which the Company has a confidentiality obligation to the third party (all such information pertaining to the Company, its affiliates or disclosed to Company under confidentiality from third parties being hereinafter referred to as "Confidential Information").  Employee further acknowledges and agrees that the Confidential Information is of great value to the Company and its affiliates and that the restrictions and agreements contained in this Agreement are reasonably necessary to protect the Confidential Information and the goodwill of the Company.  Accordingly, Employee hereby agrees that:

5

(a)    Employee will not, while employed by the Company or for two years thereafter, directly or indirectly, except in connection with Employee's performance of the duties under this Agreement, or as otherwise authorized in writing by the Company for the benefit of the Company or its "Affiliates" (as hereinafter defined), divulge to any person, firm, corporation, limited liability company, or organization, other than the Company or its Affiliates (hereinafter referred to as "Third Parties"), or use or cause or authorize any Third Parties to use, the Confidential Information, except as required by law; and

(b)    Upon the termination of Employee's employment for any reason whatsoever, Employee shall deliver or cause to be delivered to the Company any and all Confidential Information, including drawings, notebooks, notes, records, keys, disks data and other documents and materials belonging to the Company or its Affiliates which is in his possession or under his control relating to the Company or its Affiliates or abstracts therefrom, regardless of the medium upon which it is stored, and will deliver to the Company upon such termination of employment any other property of the Company or its Affiliates which is in his possession or control.

4.2    Non-Solicitation Covenant.  Employee hereby covenants and agrees that while employed by the Company and for a period of one (1) year following the termination of the Employee's employment with the Company for any reason, Employee shall not: (i) directly or indirectly, endeavor to entice away from the Company or its Affiliates any person, firm, corporation, limited liability company or other entity that was a customer of the Company at any time while Employee was an employee of the Company or its Affiliates or who is a "prospective vendor or customer" of the Company; or (ii) induce, attempt to induce or hire any employee (or any person who was an employee during the year preceding the date of any solicitation) of the Company or its Affiliates to leave the employ of the Company or its Affiliates or to otherwise perform services directly or indirectly for others, or in any way interfere with the relationship between any such employee and the Company or its Affiliates.   For purposes hereof, "prospective vendor or customer" shall mean any person or entity which has been solicited for business by Employee or any officer or other employee of the Company or its Affiliates at any time during Employee's employment.

4.3    Non-Competition Covenant.  Employee acknowledges that the covenants set forth in this Section 4.3 are reasonable.  Employee also acknowledges that the enforcement of the covenants set forth in this Section 4.3 will not preclude Employee form being gainfully employed in such manner and to the extent as to provide a standard of living for himself, the members of his family and the others dependent upon him of at least the level to which he and they have become accustomed and may expect.  Employee hereby agrees that he shall not, during his employment and for a period of one (1) year after the end of his employment directly or indirectly, engage in any proprietorship, partnership, firms trust, company, limited liability company or other entity, other than the Company (whether as owner, partner, trustee, beneficiary, stockholder, member, officer, director, employee, independent contractor, agent, servant, consultant, manager, lessor, lessee, or otherwise) that competes with the Company in the Business of the Company in the Restricted Territory (as defined herein), other than acquiring an ownership interest in a company listed on a recognized Stock exchange in an amount which does not exceed five percent (5%) of the outstanding Stock of such corporation. The term can be extended by the company for an annual fee of $42,000. For purposes of this Agreement: (i) the term "Business of the Company" shall include all business activities and ventures related to the

6

sale of electronic shelf label systems and associated parts, components, software and products derivative of any of the foregoing, and all other businesses in which the Company subsequently is engaged in prior to, and on the date of, termination of Employee's employment; and (ii) the term "Restricted Territory" means any state in the United States of America.

4.4     Remedies.

(a)     Injunctive Relief.   Employee expressly acknowledges and agrees that a violation of any of the provisions of Sections 4.1, 4.2 or 4.3 could cause immediate and irreparable harm, loss and damage to the Company not adequately compensable by a monetary award.  Employee further acknowledges and agrees that the time periods and territorial areas provided for herein are reasonable in order to adequately protect the Business of the Company, the enjoyment of the Confidential Information and the goodwill of the Company.  Without limiting any of the other remedies available to the Company at law or in equity, or the Company's right or ability to collect money damages, Employee agrees that any actual or threatened violation of any of the provisions of Sections 4.1, 4.2, or 4.3 may be immediately restrained or enjoined by any court of competent jurisdiction, injunction may be issued in any court of competent jurisdiction, without notice and without bond.  Notwithstanding anything to the contrary contained in this Agreement, the provisions of this Article IV shall survive the termination of Employee's employment.

(b)     Enforcement:   It is the desire of the parties that the provisions of Sections 4.1, 4.2, or 4.3 be enforced to the fullest extent permissible under the laws and public policies in each jurisdiction in which enforcement might be sought.  Accordingly, if any particular portion of Sections 4.1, 4.2 or 4.3 shall ever be adjudicated as invalid or unenforceable, or if the application thereof to any party or circumstance shall be adjudicated to be prohibited by or invalidated by such laws or public policies, such section or sections shall be:  (i) deemed amended to delete there from such portions so adjudicated; or (ii) modified as determined appropriate by such a court, such deletions or modifications to apply only with respect to the operation of such section or sections in the particular jurisdictions so adjudicating on the parties and under the circumstances as to which so adjudicated.

(c)     Legal Fees.   In any action to enforce the terms of this Agreement, the prevailing party shall be entitled to reimbursement from the other party of reasonable legal fees and costs.

4.5     Company.   All references to the Company in this Article IV shall include "Affiliates" of the Company, as that term is construed under Rule 405 of the Securities Act of 1933, as amended.

4.6     Quit Claims.   By execution of this Agreement, Employee: (i) assigns and quit claims to the Company all right, title and interest as relates to the Business of the Company in any patentable or potentially patentable invention or design within the meaning of Title 35 of the United States Code, and any utility or design created or discovered by the Employee during the course of his employment with the Company; and (ii) agrees that if during the course of his employment by the Company, he discovers, invents or produces, without limitation, any information, formulae, product, device, software, system, technique, drawing, program or process, which is a "trade secret" within applicable law or deemed to be such in the opinion of

7

the Company's board of directors, such information formulae, product, device, system, technique, drawing, program or process shall be assigned to the Company. Employee agrees to fully cooperate with the Company in: (A) protecting the value and secrecy of any such trade secrets, and further agrees to execute any and all documents the Company deems necessary to document any such assignment to the Company; and (B) Employee designates the Company his attorney-in-fact to execute any documents the Company may deem necessary that relates to any such trade secret or assignment thereof to the Company.

From approximately July 2010 through the date of this agreement, the Employee, through his affiliate, Kayser Ventures, Ltd., was engaged by the Company as a consultant. The Company and Employee acknowledge that no written agreement was executed in conjunction with Employee's work for the Company as a consultant. By execution of this Agreement, Employee further assigns and quit claims to the Company all right, title and interest as it relates to the Business of the Company in any patentable or potentially patentable invention or design within the meaning of Title 35 of the United States Code, and any utility or design created or discovered by the Employee during the course of his aforementioned engagement as a consultant for the Company. Employee agrees that consideration for his engagement as a consultant paid to his affiliate, Kayser Ventures, Ltd., together with the benefits of this Agreement, constitute fair and adequate consideration for this assignment and quit claim.

Notwithstanding anything to the contrary herein, this Agreement does not apply to any invention ("Employee Owned Invention(s)") for which no equipment, supplies, facility or trade secret information of the Company was used and which was developed entirely on the Employee's own time, unless: (a) the invention relates: (i) to the Business of the Company; or (ii) to the Company's actual research or development; or (b) the invention results from any work performed by the Employee for the Company. Except as noted on the signature page hereof, Employee claims no right in any inventions as of the date hereof.

4.7    Pursuant to Employee's previous engagement by the Company as a consultant, through Employee's affiliate, Kayser Ventures, Ltd. as described in Article IV, Section 4.6 above, the Company and Employee mutually acknowledge and agree that there was a lapse in compensation to Kayser Ventures, Ltd. for approximately a 6 month period from June 1, 2012 to on or about November 30, 2012 during which time Employee was working less than full time on activities related to the Business of the Company. The Company and Employee further mutually acknowledge and agree that the Company will pay the sum of $75,000 to Kayser Ventures, Ltd. for consulting services provided to the Company during this time period. The Company will pay Kayser Ventures, Ltd. the $75,000 in 15 equal monthly installments beginning August 1, 2012. When the anticipated $5,000,000 is raised, the balance is due.

## ARTICLE V
## MISCELLANEOUS

5.1    Notices.  All notices or other communications required or permitted hereunder shall be in writing addressed to the last known address of the Party entitled to notice and shall be deemed given, delivered and received: (a) when delivered, if delivered personally; (b) four (4) days after mailing, when sent by registered or certified mail, return receipt requested and postage prepaid; (c) one (1) business day after delivery to a private courier service, when delivered to a private courier service providing documented overnight service; and (d) on the date of delivery if delivered by telecopy, receipt confirmed, provided that a confirmation copy is sent on the next business day by first class mail, postage prepaid, in each case addressed as follows:

8

To Employee at:     The address set forth on the signature page hereof.

To Company at:      Tagnetics, Inc.
                    2650 Indian Ripple Road
                    Dayton, OH 45440
                    Attention:    President
                    Telephone:    937-320-9225
                    Facsimile:    937-320-9726
                    E-Mail:       rearley@tagnetics.com

                    *with a copy to:*

                    Mitchell D. Goldsmith, Esq.
                    c/o Shefsky & Froelich Ltd.
                    111 East Wacker Drive – Suite 2800
                    Chicago, IL  60601
                    Telephone:    312-836-4006
                    Facsimile:    312-275-7569
                    E-Mail:       mgoldsmith@shefskylaw.com

Any party may change its address for purposes of this paragraph by giving the other party written notice of the new address in the manner set forth above.

5.2    Entire Agreement; Amendments, Etc.    This Agreement contains the entire agreement and understanding of the parties hereto, and supersedes all prior agreements and understandings relating to the subject matter hereof.  Except as provided in Section 4.4(b) above, no modification, amendment, waiver or alteration of this Agreement or any provision or term hereof shall in any event be effective unless the same shall be in writing, executed by both parties hereto, and any waiver so given shall be effective only in the specific instance and for the specific purpose for which given.

5.3    Benefit.  This Agreement shall be binding upon, and inure to the benefit of, and shall be enforceable by, the heirs, successors, legal representatives and permitted assignees of Employee and the successors, assignees and transferees of the Company.  This Agreement or any right or interest hereunder may not be assigned by Employee without the prior written consent of the Company.

5.4    No Waiver.  No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder or pursuant hereto shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder or pursuant thereto.

5.5    Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law but, if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provision of this Agreement.  If any part of any covenant is unenforceable or the making of any covenant hereunder is unenforceable, the parties hereto agree, and it is their desire, that the court shall substitute a judicially enforceable limitation in its

9

place, and that as so modified this Agreement, as so modified, shall be binding upon the parties as if originally set forth herein.

5.6    Compliance and Headings.    Time is of the essence of this Agreement.  The headings in this Agreement are intended to be for convenience and reference only, and shall not define or limit the scope, extent or intent or otherwise affect the meaning of any portion hereof.

5.7    Arbitration.    If there is any dispute between the parties concerning any matter relating to this Agreement, the exclusive basis for adjudication of this Agreement (except with respect to the performance of the covenants and obligations as set forth in Article IV above) shall be by arbitration as detailed herein.  Either party may submit the dispute to binding arbitration. Any such arbitration proceeding will be conducted in Dayton, Ohio and except as otherwise provided in this Agreement, will be conducted under the auspices of JAMS/Mediation, Inc., in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association.  The arbitrator shall allow such discovery as the arbitrator determines appropriate under the circumstances.  The arbitrator shall determine which party, if either, prevailed and shall award the prevailing party its costs.  Each party will bear his, her or its respective attorneys' fees.  The award and decision of the arbitrator shall be conclusive and binding on all parties to this Agreement and judgment on the award may be entered in any court of competent jurisdiction.  The parties acknowledge and agree that any arbitration award may be enforced against either or both of them in a court of competent jurisdiction and each waives any right to contest the validity or enforceability of such award.  The parties further agree to be bound by the provisions of any statute of limitations which would be applicable in a court of law to the controversy or claim which is the subject of any arbitration proceeding initiated under the Agreement.  The parties further agree that they are entitled in any arbitration proceeding to the entry of an order, by a court of competent jurisdiction pursuant to an opinion of the arbitrator, for specific performance of any of the requirements of this Agreement.

In any action to enforce any of the provisions of Article IV hereof, the action shall be litigated in the state or federal courts situated in or closest to Dayton, Ohio, to which jurisdiction and venue all parties consent.  Each party hereby waives his, her or its right to trial by jury with respect to such action and agrees that the prevailing party such action shall be entitled to reimbursement from the other party of his, her or its legal fees and costs incurred in connection with such actions.  Company shall be entitled to injunctive relief, without the necessity of posting bond to remedy any breach of any of the terms of Article IV of this Agreement by Employee.

5.8    Governing Law.    The parties agree that this Agreement shall be governed by, interpreted and construed in accordance with the laws of the State of Delaware.  Any action to enforce the terms of this Agreement shall be litigated in the state or federal courts situated in or nearest to Dayton Ohio, to which jurisdiction and venue all parties consent.  All parties waive their right to a jury trial with respect to litigation of this Agreement.

5.9    Counterparts.    This Agreement may be executed in one or more counterparts, whether by original, photocopy, facsimile or e-mail attachment in PDF format, each of which will be deemed an original and all of which together will constitute one and the same instrument.

5.10    Recitals.    The Recitals set forth above are hereby incorporated in and made a part of this Agreement by this reference.

5.11   Indemnification.  The Company shall indemnify and hold Employee harmless to the fullest extent permitted by law and under the Articles and bylaws of the Company as, to and from any and all costs, expenses (including reasonable attorneys' fees, which shall be paid in advance by the Company, subject to recoupment in accordance with applicable law) or damages incurred by Employee as a result of any claim, suit, action or judgment arising out of the activities of the Company or its Affiliates or the Employee's activities as an employee, officer or director of the Company or any related company; provided, however that the Employee shall not be entitled to indemnification hereunder to the extent the damages are the result of actions or omissions which have been finally adjudicated by a court of competent jurisdiction to constitute gross negligence or willful or intentional misconduct by the Employee.  This provision shall survive the termination of this Agreement.

5.12   Survival.  Employee's obligations under Article IV hereof shall survive any termination of this Agreement.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

11

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed and delivered as of the day and year first above written.

COMPANY:

TAGNETICS, INC.

By: _____
       Ronald E. Earley
       President & Chief Operating Officer

EMPLOYEE:

_____
KENNETH W. KAYSER

Address: _____
         _____

*Employee Owned Inventions:* _____

1168096_3

12

## EXHIBIT A

*Base Salary*....................  $250,000 per annum, subject to increase in the sole discretion of the Board of Directors of the Company. The first $180,000 of the Employee's annual compensation will be paid currently. The remaining $70,000 of annual salary will be deferred in accordance with the terms of the Company's Deferred Compensation Plan.

*Bonus*............................  Employee shall be entitled to earn an annual bonus as determined by the Board of Directors in its sole discretion.

*Benefits*.........................  Employee shall be entitled to receive all offered health benefits for himself and his family, at no additional cost, in an amount not less than the greatest level of coverage offered to other employees in the Company. Employee will be eligible for consideration for annual grants with respect to the Company's stock option plan, as determined in the sole discretion of the Board of Directors.

1168096_3

A-1

# EXHIBIT 6

## EMPLOYMENT, NON-COMPETITION
## AND PROPRIETARY RIGHTS AGREEMENT

THIS EMPLOYMENT NON-COMPETITION AND PROPRIETARY RIGHTS AGREEMENT (the "Agreement") is effective as of the 1st day of January, 20111, by and between TAGNETICS, INC., a Delaware corporation (the "Company"), and RONALD EARLEY (the "Employee").

### RECITALS:

A.     The Company is engaged in the manufacture and sale of electronic shelf tag systems and related products and services.

B.     The Company desires to employ the Employee and Employee desires to be employed by the Company as its President, subject to the terms, conditions and covenants hereinafter set forth; and

C.     As a condition of the Company employing the Employee, Employee has agreed not to divulge to the public the Company's confidential information, not to solicit the Company's vendors, customers or employees and not to compete with the Company, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the agreements, covenants and conditions set forth herein, the Employee and the Company hereby agree as follows:

### ARTICLE I
### EMPLOYMENT

1.1     <u>Employment</u>.  The Company hereby employs, engages and hires Employee, and Employee hereby accepts employment, upon the terms and conditions set forth in this Agreement.  Employee is employed as the Company's President and reports exclusively to the Company's board of directors.  The duties of the President shall be those customary for such position.

1.2     <u>Activities and Duties During Employment</u>.  Employee represents and warrants to the Company that Employee is free to accept employment with the Company and that Employee has no prior or other commitments or obligations of any kind to anyone else which would hinder or interfere with the acceptance and performance of the obligations under this Agreement.

Employee accepts the employment described in <u>Article I</u> of this Agreement and agrees to devote his exclusive full time and efforts to the faithful and diligent performance of the services described herein, including the performance of such other services and responsibilities as the Company may, from time to time, stipulate.  Notwithstanding the foregoing, Employee may:  (i) serve on the board of directors of other entities or serve in any capacity with any hobby, avocation, civic, educational, religious, professional or charitable activity or organization provided that such service does not materially interfere or conflict with his duties hereunder; and (ii) make and manage personal investments of his choice.  Employee shall comply with and be

bound by the Company's operating policies, procedures and practices in effect from time to time during the terms of his employment.

1.3    Scheduled Work Week.  Employee's regularly scheduled work week shall consist of five (5) days (Monday through Friday) from 8:30 a.m. to 5:30 p.m., subject to such additional time if necessary to fulfill duties reasonably assigned to Employee.

## ARTICLE II
## TERM

2.1    Term.  The term of employment under this Agreement shall be two (2) years, commencing as of the date of the Agreement (such term of employment, as it may be extended or terminated, is herein referred to as the "Employment Term"), which Employment Term shall automatically renew for additional one (1) year periods unless terminated by Employee or the Company by written notice not less than thirty (30) days prior to expiration of the then-current term.

2.2    Termination.  The Employment Term and Employment of Employee may be terminated as follows:

(a)    Automatically, without the action of either party, upon the death of the Employee.

(b)    By either party upon the Total Disability of the Employee.  The Employee shall be considered to have a Total Disability for purposes of this Agreement if he is unable, by reason of accident or illness or mental disability, to substantially perform his employment duties for a period of three (3) months during any period of twelve (12) consecutive months.  The determination of whether a Total Disability has occurred shall be based on the determination of a physician selected by the Company.  Nothing herein shall limit the Employee's right to receive any payments to which Employee may be entitled under any disability or employee benefit plan of the Company or under any disability or insurance policy or plan.  During a period of Total Disability prior to termination hereunder, Employee shall continue to receive his full compensation (including base salary and bonus) and benefits.

(c)    By the Employee upon thirty (30) days' written notice to the Company.

(d)    Automatically, without the action of either party, upon expiration of the Employment Term.

(e)    By the Company "Without Cause," and without notice which shall mean a termination of the Employee's employment by the Company other than pursuant to the provisions of Section 2.2(a), Section 2.2(b) and Section 2.2(f) hereof.  Any termination of Employee which occurs within one year following a "Change in Control" of Company, shall be deemed a termination Without Cause.  For purposes of this Agreement, a "Change in Control" occurs when there is: (a) a sale of substantially all of the assets of the Company; (b) a replacement of a majority of the existing directors of the Company; (c) any person or entity that is not a shareholder of the Company as of the date of this Agreement, becomes the beneficial owner, directly or indirectly, of securities of the Company representing more than fifty percent

2

(50%) of the Company's outstanding securities; (d) the approval of a merger, sale or consolidation of the Company with any other company, other than a merger or consolidation which would result in the voting securities of Company outstanding immediately prior thereto continuing to represent more than fifty percent (50%) of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger consolidation; or (e) the shareholders and/or board of directors of the Company approve a plan of liquidation, dissolution or winding up of the Company.

      (f)    By the Company for "Cause" (as defined below).

      2.3    <u>Cessation of Rights and Obligations: Survival of Certain Provisions</u>.  On the date of expiration or earlier termination of the Employment Term for any reason, all of the respective rights, duties, obligations and covenants of the parties, as set forth herein, shall except as specifically provided herein to the contrary, cease and become of no further force or effect as of the date of said termination, and shall only survive as expressly provided for herein.

      2.4    <u>Cessation of Compensation</u>.  In lieu of any severance under any severance plan that the Company may then have in effect, and subject to:  (i) the receipt of a full and unconditional release from Employee; and (ii) any amounts owed by the Employee to the Company under any contract, agreement or loan document entered into after the date hereof (including, but not limited to, loans made by the Company to the Employee), the Company shall pay to the Employee, and the Employee shall be entitled to receive, the following amounts within thirty (30) days of the date of termination of his employment in full satisfaction of any obligation to Employee for termination of this Agreement:

      (a)    <u>Voluntary Termination/Termination For Cause</u>.  Upon:  (i) termination of the Employee's employment pursuant to <u>Sections 2.2(c) or (f)</u>; or (ii) the expiration of the Employment Term pursuant to <u>Section 2.2(d)</u>, because the Employee elects not to extend the Employment Term, Employee shall be entitled to receive his base salary, bonus, benefits and expense reimbursements solely through the date of termination.

      (b)    <u>Death/Total Disability</u>.  Upon the termination of the Employment Term by reason of the death or Total Disability of the Employee, pursuant to <u>Sections 2.2(a) or (b)</u>, the Employee (or, in the case of death, his estate) shall be entitled to receive his base salary through the date of death or determination of Total Disability plus twelve (12) months, which shall include any of his unused vacation pay and unpaid bonus (if any) (subject to applicable withholding tax) based on the percentage of the calendar year through the date of termination of employment, multiplied by the bonus earned by the Employee in the immediately preceding calendar year.

      (c)    <u>Without Cause</u>.  If Employee's employment is terminated Without Cause, pursuant to <u>Section 2.2(e)</u>, Employee will be entitled to receive: (i)  his base salary through the date of termination; plus (ii) twelve months' additional base salary (payable over the next twelve months consistent with normal payroll practice; plus (iii) any of his unused vacation pay; plus (iv) and unpaid bonus (if any) (subject to applicable withholding tax) based on the percentage of the calendar year through the date of termination of employment, multiplied by the bonus earned by the Employee in the immediately preceding calendar year.

Provided that Employee makes a timely election to continue coverage under the Company's group health plans pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), health insurance benefits with the same coverage (subject to Company's right to change coverage as set forth in the last sentence of this Section) provided to Employee prior to the termination (e.g. medical, dental, optical, mental health) will be provided at the Company's cost for eighteen (18) months following the termination date, but not longer than until Employee is covered by comparable health insurance benefits from another employer or is otherwise ineligible for COBRA continuation coverage. Nothing contained herein shall restrict the ability of the Company or its successor from changing some or all of the terms of such health insurance benefits, the cost to participants or other features of such benefits; provided, however, that all similarly situated participants are treated the same.

2.5    Business Expenses.

(a)    Reimbursement.  The Company shall reimburse the Employee for all reasonable, ordinary, and necessary business expenses incurred by him in connection with the performance of his duties hereunder, including, but not limited to, ordinary and necessary travel expenses and entertainment expenses.  The reimbursement of business expenses will be governed by the policies for the Company and the terms otherwise set forth herein.

(b)    Accounting.  The Employee shall provide the Company with an accounting of his expenses, which accounting shall clearly reflect which expenses were incurred for proper business purposes in accordance with the policies adopted by the Company and as such are reimbursable by the Company. The Employee shall provide the Company with such other supporting documentation and other substantiation of reimbursable expenses as will conform to Internal Revenue Service or other requirements.  All such reimbursements shall be payable by the Company to the Employee within a reasonable time after receipt by the Company of appropriate documentation therefore.

2.6    Cause.  For purposes of this Agreement, "Cause" for Employee's termination will exist if the Company terminates Employee's employment for any of the following reasons: (i) Employee willfully fails to substantially perform his duties hereunder (other than any such failure due to his physical or mental illness), and such willful failure is not remedied within ten (10) business days after written notice from the Company's board of directors, which written notice shall state that failure to remedy such conduct may results in an involuntary termination for Cause; (ii) Employee engages in willful and serious misconduct (including, but not limited to, an act of fraud or embezzlement) that has caused or is reasonably expected to result in material injury to the Company or any of its Affiliates; (iii) Employee is convicted of or enters a plea of guilty or nolo contendere to a:  (A) crime that materially adversely affects his ability to perform his duties on behalf of the Company; or (B) felony; or (iv) Employee engages in alcohol or substance abuse which adversely affects his ability to perform his duties.

**ARTICLE III**
**COMPENSATION AND BENEFITS**

3.1    Compensation.  During Employee's employment, the Company shall pay Employee such salary, bonus and other benefits and awards as set forth on Exhibit A.

4

3.2     Payment. Except as otherwise provided herein, all compensation shall be payable in intervals in accordance with the general payroll payment practice of the Company. The compensation shall be subject to such withholdings and deductions by the Company as are required by law.

3.3     Vacation. The Employee shall be entitled to receive 160 hours of personal time off ("PTO") each year of the Employment Term beginning on the date hereof and continuing with each one year extension of the Employment Term; any PTO time not taken during each year of the Employment Term shall carry over to the next year, subject to a maximum aggregate carry over of 160 hours of PTO.

3.4     Other Benefits. Employee shall be entitled to participate in any retirement, pension, profit-sharing, stock option, health plan, insurance, disability income, incentive compensation and welfare or any other benefit plan or plans of the Company which may now or hereafter be in effect and for which the Employee is eligible or for which all senior executives in general are eligible. Notwithstanding the forgoing, the Company shall be under no obligation to institute or continue the existence of any such benefit plan.

**ARTICLE IV**
**CONFIDENTIALITY, NON-SOLICITATION, NON-COMPETE**
**AND QUIT CLAIM AGREEMENT**

4.1     Non-Disclosure of Confidential Information. Employee hereby acknowledges and agrees that, as of a result of the employment hereunder, Employee will acquire, develop, and use information that is not generally known to the public or to the Company's industry, including but not limited to, certain records, phone locations, documentation, software programs, price lists, customer lists, contract prices for the Company's services, business plans and prospects of the Company, equipment configurations, ledgers and general information, employee records, mailing lists, manufacturing techniques, product formulations, accounts receivable and payable ledgers, financial and other records of the Company or its affiliates, and other similar matters, as well as any information disclosed to the Company by any third party under which the Company has a confidentiality obligation to the third party (all such information pertaining to the Company, its affiliates or disclosed to Company under confidentiality from third parties being hereinafter referred to as "Confidential Information"). Employee further acknowledges and agrees that the Confidential Information is of great value to the Company and its affiliates and that the restrictions and agreements contained in this Agreement are reasonably necessary to protect the Confidential Information and the goodwill of the Company. Accordingly, Employee hereby agrees that:

(a)     Employee will not, while employed by the Company or for two years thereafter, directly or indirectly, except in connection with Employee's performance of the duties under this Agreement, or as otherwise authorized in writing by the Company for the benefit of the Company or its "Affiliates" (as hereinafter defined), divulge to any person, firm, corporation, limited liability company, or organization, other than the Company or its Affiliates (hereinafter referred to as "Third Parties"), or use or cause or authorize any Third Parties to use, the Confidential Information, except as required by law; and



5

(b)     Upon the termination of Employee's employment for any reason whatsoever, Employee shall deliver or cause to be delivered to the Company any and all Confidential Information, including drawings, notebooks, notes, records, keys, disks data and other documents and materials belonging to the Company or its Affiliates which is in his possession or under his control relating to the Company or its Affiliates or abstracts therefrom, regardless of the medium upon which it is stored, and will deliver to the Company upon such termination of employment any other property of the Company or its Affiliates which is in his possession or control.

4.2     Non-Solicitation Covenant.  Employee hereby covenants and agrees that while employed by the Company and for a period of one (1) year following the termination of the Employee's employment with the Company for any reason, Employee shall not: (i) directly or indirectly, endeavor to entice away from the Company or its Affiliates any person, firm, corporation, limited liability company or other entity that was a customer of the Company at any time while Employee was an employee of the Company or its Affiliates or who is a "prospective vendor or customer" of the Company; or (ii) induce, attempt to induce or hire any employee (or any person who was an employee during the year preceding the date of any solicitation) of the Company or its Affiliates to leave the employ of the Company or its Affiliates or to otherwise perform services directly or indirectly for others, or in any way interfere with the relationship between any such employee and the Company or its Affiliates.  For purposes hereof, "prospective vendor or customer" shall mean any person or entity which has been solicited for business by Employee or any officer or other employee of the Company or its Affiliates at any time during Employee's employment.

4.3     Non-Competition Covenant.  Employee acknowledges that the covenants set forth in this Section 4.3 are reasonable.  Employee also acknowledges that the enforcement of the covenants set forth in this Section 4.3 will not preclude Employee form being gainfully employed in such manner and to the extent as to provide a standard of living for himself, the members of his family and the others dependent upon him of at least the level to which he and they have become accustomed and may expect.  Employee hereby agrees that he shall not, during his employment and for a period of two (2) years after the end of his employment directly or indirectly, engage in any proprietorship, partnership, firms trust, company, limited liability company or other entity, other than the Company (whether as owner, partner, trustee, beneficiary, stockholder, member, officer, director, employee, independent contractor, agent, servant, consultant, manager, lessor, lessee, or otherwise) that competes with the Company in the Business of the Company in the Restricted Territory (as defined herein), other than acquiring an ownership interest in a company listed on a recognized Stock exchange in an amount which does not exceed five percent (5%) of the outstanding Stock of such corporation.  For purposes of this Agreement:  (i) the term "Business of the Company" shall include all business activities and ventures related to the sale of electronic shelf label systems and associated parts, components, software and products derivative of any of the foregoing, and all other businesses in which the Company subsequently is engaged in prior to, and on the date of, termination of Employee's employment; and (ii) the term "Restricted Territory" means any state in the United States of America.

4.4     Remedies.

6

(a)  Injunctive Relief.  Employee expressly acknowledges and agrees that a violation of any of the provisions of Sections 4.1, 4.2 or 4.3 could cause immediate and irreparable harm, loss and damage to the Company not adequately compensable by a monetary award.  Employee further acknowledges and agrees that the time periods and territorial areas provided for herein are reasonable in order to adequately protect the Business of the Company, the enjoyment of the Confidential Information and the goodwill of the Company.  Without limiting any of the other remedies available to the Company at law or in equity, or the Company's right or ability to collect money damages, Employee agrees that any actual or threatened violation of any of the provisions of Sections 4.1, 4.2, or 4.3 may be immediately restrained or enjoined by any court of competent jurisdiction, injunction may be issued in any court of competent jurisdiction, without notice and without bond.  Notwithstanding anything to the contrary contained in this Agreement, the provisions of this Article IV shall survive the termination of Employee's employment.

(b)  Enforcement:  It is the desire of the parties that the provisions of Sections 4.1, 4.2, or 4.3 be enforced to the fullest extent permissible under the laws and public policies in each jurisdiction in which enforcement might be sought.  Accordingly, if any particular portion of Sections 4.1, 4.2 or 4.3 shall ever be adjudicated as invalid or unenforceable, or if the application thereof to any party or circumstance shall be adjudicated to be prohibited by or invalidated by such laws or public policies, such section or sections shall be: (i) deemed amended to delete there from such portions so adjudicated; or (ii) modified as determined appropriate by such a court, such deletions or modifications to apply only with respect to the operation of such section or sections in the particular jurisdictions so adjudicating on the parties and under the circumstances as to which so adjudicated.

(c)  Legal Fees.  In any action to enforce the terms of this Agreement, the prevailing party shall be entitled to reimbursement from the other party of reasonable legal fees and costs.

4.5   Company.  All references to the Company in this Article IV shall include "Affiliates" of the Company, as that term is construed under Rule 405 of the Securities Act of 1933, as amended.

4.6   Quit Claims.  By execution of this Agreement, Employee: (i) assigns and quit claims to the Company all right, title and interest as relates to the Business of the Company in any patentable or potentially patentable invention or design within the meaning of Title 35 of the United States Code, and any utility or design created or discovered by the Employee during the course of his employment with the Company; and (ii) agrees that if during the course of his employment by the Company, he discovers, invents or produces, without limitation, any information, formulae, product, device, software, system, technique, drawing, program or process, which is a "trade secret" within applicable law or deemed to be such in the opinion of the Company's board of directors, such information formulae, product, device, system, technique, drawing, program or process shall be assigned to the Company.  Employee agrees to fully cooperate with the Company in:  (A) protecting the value and secrecy of any such trade secrets, and further agrees to execute any and all documents the Company deems necessary to document any such assignment to the Company; and (B) Employee designates the Company his attorney-in-fact to execute any documents the Company may deem necessary that relates to any such trade secret or assignment thereof to the Company.

7

Notwithstanding anything to the contrary herein, this Agreement does not apply to any invention ("Employee Owned Invention(s)") for which no equipment, supplies, facility or trade secret information of the Company was used and which was developed entirely on the Employee's own time, unless: (a) the invention relates: (i) to the Business of the Company; or (ii) to the Company's actual research or development; or (b) the invention results from any work performed by the Employee for the Company.  Except as noted on the signature page hereof, Employee claims no right in any inventions as of the date hereof.

## ARTICLE V
## MISCELLANEOUS

5.1    Notices.  All notices or other communications required or permitted hereunder shall be in writing addressed to the last known address of the Party entitled to notice and shall be deemed given, delivered and received:  (a) when delivered, if delivered personally; (b) four (4) days after mailing, when sent by registered or certified mail, return receipt requested and postage prepaid; (c) one (1) business day after delivery to a private courier service, when delivered to a private courier service providing documented overnight service; and (d) on the date of delivery if delivered by telecopy, receipt confirmed, provided that a confirmation copy is sent on the next business day by first class mail, postage prepaid, in each case addressed as follows:

| | |
|---|---|
| To Employee at: | The address set forth on the signature page hereof. |
| To Company at: | Tagnetics, Inc. <br> 2650 Indian Ripple Road <br> Dayton, Ohio 45440 <br> Attention:      Chairman of the Board <br> Telephone:  937-320-9225 <br> Facsimile:  937-320-9726 <br> E-Mail: kwk@kayserventures.com |
| with a copy to: | Mitchell D. Goldsmith, Esq. <br> c/o Shefsky & Froelich Ltd. <br> 111 E. Wacker #2800 <br> Chicago, Il. 60601 <br> Telephone: 312-836-4006 <br> Facsimile: 312-275-7569 <br> E-Mail: mgoldsmith@shefskylaw.com |

Any party may change its address for purposes of this paragraph by giving the other party written notice of the new address in the manner set forth above.

5.2    Entire Agreement; Amendments, Etc.  This Agreement contains the entire agreement and understanding of the parties hereto, and supersedes all prior agreements and understandings relating to the subject matter hereof.  Except as provided in Section 4.4(b) above, no modification, amendment, waiver or alteration of this Agreement or any provision or term hereof shall in any event be effective unless the same shall be in writing, executed by both parties hereto, and any waiver so given shall be effective only in the specific instance and for the specific purpose for which given.

8

5.3     Benefit.  This Agreement shall be binding upon, and inure to the benefit of, and shall be enforceable by, the heirs, successors, legal representatives and permitted assignees of Employee and the successors, assignees and transferees of the Company.  This Agreement or any right or interest hereunder may not be assigned by Employee without the prior written consent of the Company.

5.4     No Waiver.  No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder or pursuant hereto shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder or pursuant thereto.

5.5     Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law but, if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provision of this Agreement.  If any part of any covenant is unenforceable or the making of any covenant hereunder is unenforceable, the parties hereto agree, and it is their desire, that the court shall substitute a judicially enforceable limitation in its place, and that as so modified this Agreement, as so modified, shall be binding upon the parties as if originally set forth herein.

5.6     Compliance and Headings.  Time is of the essence of this Agreement.  The headings in this Agreement are intended to be for convenience and reference only, and shall not define or limit the scope, extent or intent or otherwise affect the meaning of any portion hereof.

5.7     Arbitration.  If there is any dispute between the parties concerning any matter relating to this Agreement, the exclusive basis for adjudication of this Agreement (except with respect to the performance of the covenants and obligations as set forth in Article IV above) shall be by arbitration as detailed herein.  Either party may submit the dispute to binding arbitration.  Any such arbitration proceeding will be conducted in Dayton, Ohio and except as otherwise provided in this Agreement, will be conducted under the auspices of JAMS/Mediation, Inc., in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association.  The arbitrator shall allow such discovery as the arbitrator determines appropriate under the circumstances.  The arbitrator shall determine which party, if either, prevailed and shall award the prevailing party its costs.  Each party will bear his, her or its respective attorneys' fees.  The award and decision of the arbitrator shall be conclusive and binding on all parties to this Agreement and judgment on the award may be entered in any court of competent jurisdiction.  The parties acknowledge and agree that any arbitration award may be enforced against either or both of them in a court of competent jurisdiction and each waives any right to contest the validity or enforceability of such award.  The parties further agree to be bound by the provisions of any statute of limitations which would be applicable in a court of law to the controversy or claim which is the subject of any arbitration proceeding initiated under the Agreement.  The parties further agree that they are entitled in any arbitration proceeding to the entry of an order, by a court of competent jurisdiction pursuant to an opinion of the arbitrator, for specific performance of any of the requirements of this Agreement.

9

In any action to enforce any of the provisions of <u>Article IV</u> hereof, the action shall be litigated in the state or federal courts situated in or closest to Dayton, Ohio, to which jurisdiction and venue all parties consent.  Each party hereby waives his, her or its right to trial by jury with respect to such action and agrees that the prevailing party such action shall be entitled to reimbursement from the other party of his, her or its legal fees and costs incurred in connection with such actions.   Company shall be entitled to injunctive relief, without the necessity of posting bond to remedy any breach of any of the terms of <u>Article IV</u> of this Agreement by Employee.

5.8   <u>Governing Law</u>.  The parties agree that this Agreement shall be governed by, interpreted and construed in accordance with the laws of the State of Delaware.  Any action to enforce the terms of this Agreement shall be litigated in the state or federal courts situated in or nearest to Dayton Ohio, to which jurisdiction and venue all parties consent.  All parties waive their right to a jury trial with respect to litigation of this Agreement.

5.9   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, whether by original, photocopy, facsimile or e-mail attachment in PDF format, each of which will be deemed an original and all of which together will constitute one and the same instrument.

5.10   <u>Recitals</u>.  The Recitals set forth above are hereby incorporated in and made a part of this Agreement by this reference.

5.11   <u>Indemnification</u>.  The Company shall indemnify and hold Employee harmless to the fullest extent permitted by law and under the Articles and bylaws of the Company as, to and from any and all costs, expenses (including reasonable attorneys' fees, which shall be paid in advance by the Company, subject to recoupment in accordance with applicable law) or damages incurred by Employee as a result of any claim, suit, action or judgment arising out of the activities of the Company or its Affiliates or the Employee's activities as an employee, officer or director of the Company or any related company; provided, however that the Employee shall not be entitled to indemnification hereunder to the extent the damages are the result of actions or omissions which have been finally adjudicated by a court of competent jurisdiction to constitute gross negligence or willful or intentional misconduct by the Employee.  This provision shall survive the termination of this Agreement.

5.12   <u>Survival</u>.  Employee's obligations under <u>Article IV</u> hereof shall survive any termination of this Agreement.

10

6-11-1995  0:12AM       FROM                                                    P. 1
08/10/2011 12:00 FAX 9373209726       TAGNETICS FAX                      ☑002

**COMPANY:**

TAGNETICS, INC.

By: _August P. Klein_

TITLE: CEO

**EMPLOYEE:**

Ronald E. EARLEY

Ronald Earley

_Ronald E. Early_

[Signature]

Address: _6429 Winding Tree Drive_
_New Carlisle, OH 45344_

Employee Owned Inventions: _0_

11

COMPANY:                                    EMPLOYEE:

TAGNETICS, INC.
                                            _____
                                            Ronald Earley

By: _____        *Ronald E. Earley*

                                            *[Signature]*

                                            *Address:*  6429 WINDING TREE DRIVE
                                                        NEW CARLISLE, OH  45344

                                            *Employee Owned Inventions:*  ___0___

11

## EXHIBIT A

Base Salary:  $200,000  per annum, subject to increase in the sole discretion of the Board of Directors of the Company.

Bonus:  Employee shall be entitled to earn an annual bonus as determined by the Board of Directors in its sole discretion, with a target not to exceed 50% of base salary in the event that the Company and Employee meet all criteria considered by the Board of Directors.

Benefits:  Employee shall be entitled to receive all offered health benefits for himself and his family, at no additional cost, in an amount not less than the greatest level of coverage offered to other employees in the Company.  Employee will be eligible for consideration for annual grants with respect to the Company's stock option plan, as determined in the sole discretion of the Board of Directors.

1164995_1.DOC



# EXHIBIT 7

## EMPLOYMENT, NON-COMPETITION
## AND PROPRIETARY RIGHTS AGREEMENT

THIS EMPLOYMENT NON-COMPETITION AND PROPRIETARY RIGHTS AGREEMENT (the "Agreement") is effective as of the 5th day of July, 2013, by and between TAGNETICS, INC., a Delaware corporation (the "Company"), and JONATHAN HAGER (the "Employee").

### RECITALS:

A.     The Company is engaged in the manufacture and sale of electronic shelf tag systems and related products and services.

B.     The Company desires to employ the Employee and Employee desires to be employed by the Company as its VICE PRESIDENT PRODUCT DEVELOPMENT, subject to the terms, conditions and covenants hereinafter set forth; and

C.     As a condition of the Company employing the Employee, Employee has agreed not to divulge to the public the Company's confidential information, not to solicit the Company's vendors, customers or employees and not to compete with the Company, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and the agreements, covenants and conditions set forth herein, the Employee and the Company hereby agree as follows:

### ARTICLE I
### EMPLOYMENT

1.1     Employment. The Company hereby employs, engages and hires Employee, and Employee hereby accepts employment, upon the terms and conditions set forth in this Agreement.   Employee is employed as the Company's VICE PRESIDENT PRODUCT DEVELOPMENT and reports exclusively to the Company's board of directors.   The duties of the VICE PRESIDENT PRODUCT DEVELOPMENT shall be those customary for such position.

1.2     Activities and Duties During Employment. Employee represents and warrants to the Company that Employee is free to accept employment with the Company and that Employee has no prior or other commitments or obligations of any kind to anyone else which would hinder or interfere with the acceptance and performance of the obligations under this Agreement.

Employee accepts the employment described in Article I of this Agreement and agrees to devote full time and efforts to the faithful and diligent performance of the services described herein, including the performance of such other services and responsibilities as the Company may, from time to time, stipulate.   Notwithstanding the foregoing, Employee may:  (i) serve on the board of directors of other entities or serve in any capacity with any hobby, avocation, civic, educational, religious, professional or charitable activity or organization provided that such service does not materially interfere or conflict with his duties hereunder; (ii) make and manage personal investments of his choice; and (iii) pursue other business activities provided that Employee spends approximately 40 hours per week working on Company matters.   Employee

shall comply with and be bound by the Company's operating policies, procedures and practices in effect from time to time during the terms of his employment.

1.3   Scheduled Work Week. Employee's work shall be performed from such locations and at such times as Employee deems necessary and proper to meet his responsibilities, subject to the day to day direction from the President.

## ARTICLE II
## TERM

2.1   Term. The term of employment under this Agreement shall be one (1) year, commencing as of the date of the Agreement (such term of employment, as it may be extended or terminated, is herein referred to as the "Employment Term"), which Employment Term shall automatically renew for additional one (1) year periods unless terminated by Employee or the Company by written notice not less than thirty (30) days prior to expiration of the then-current term.

2.2   Termination. The Employment Term and Employment of Employee may be terminated as follows:

(a)   Automatically, without the action of either party, upon the death of the Employee.

(b)   By either party upon the Total Disability of the Employee. The Employee shall be considered to have a Total Disability for purposes of this Agreement if he is unable, by reason of accident or illness or mental disability, to substantially perform his employment duties for a period of three (3) months during any period of twelve (12) consecutive months. The determination of whether a Total Disability has occurred shall be based on the determination of a physician selected by the Company. Nothing herein shall limit the Employee's right to receive any payments to which Employee may be entitled under any disability or employee benefit plan of the Company or under any disability or insurance policy or plan. During a period of Total Disability prior to termination hereunder, Employee shall continue to receive his full compensation (including base salary and bonus) and benefits.

(c)   By the Employee upon thirty (30) days' written notice to the Company.

(d)   By the Company upon thirty (30) days' written notice to the Employee.

(e)   By the Company "Without Cause," and without notice which shall mean a termination of the Employee's employment by the Company other than pursuant to the provisions of Section 2.2(a), Section 2.2(b) and Section 2.2(f) hereof. Any termination of Employee which occurs within one year following a "Change in Control" of Company shall be deemed a termination Without Cause. For purposes of this Agreement, a "Change in Control" occurs when there is: (a) a sale of substantially all of the assets of the Company; (b) a replacement of a majority of the existing directors of the Company; (c) any person or entity that is not a shareholder of the Company as of the date of this Agreement, becomes the beneficial owner, directly or indirectly, of securities of the Company representing more than fifty percent (50%) of the Company's outstanding securities; (d) the approval of a merger, sale or consolidation of the Company with any

2

other company, other than a merger or consolidation which would result in the voting securities of Company outstanding immediately prior thereto continuing to represent more than fifty percent (50%) of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger consolidation; or (e) the shareholders and/or board of directors of the Company approve a plan of liquidation, dissolution or winding up of the Company.

      (f)     By the Company for "Cause" (as defined below).

     2.3    Cessation of Rights and Obligations: Survival of Certain Provisions. On the date of expiration or earlier termination of the Employment Term for any reason, all of the respective rights, duties, obligations and covenants of the parties, as set forth herein, shall except as specifically provided herein to the contrary, cease and become of no further force or effect as of the date of said termination, and shall only survive as expressly provided for herein.

     2.4    Cessation of Compensation. In lieu of any severance under any severance plan that the Company may then have in effect, and subject to: (i) the receipt of a full and unconditional release from Employee; and (ii) any amounts owed by the Employee to the Company under any contract, agreement or loan document entered into after the date hereof (including, but not limited to, loans made by the Company to the Employee), the Company shall pay to the Employee, and the Employee shall be entitled to receive, the following amounts within thirty (30) days of the date of termination of his employment in full satisfaction of any obligation to Employee for termination of this Agreement:

      (a)    Voluntary Termination/Termination For Cause. Upon: (i) termination of the Employee's employment pursuant to Sections 2.2(c) or (f); or (ii) the expiration of the Employment Term pursuant to Section 2.2(d), because the Employee elects not to extend the Employment Term, Employee shall be entitled to receive his base salary, bonus, benefits and expense reimbursements solely through the date of termination.

      (b)    Death/Total Disability. Upon the termination of the Employment Term by reason of the death or Total Disability of the Employee, pursuant to Sections 2.2(a) or (b), the Employee (or, in the case of death, his estate) shall be entitled to receive his base salary through the date of death or determination of Total Disability plus three (3) months, which shall include any of his unused vacation pay and unpaid bonus (if any) (subject to applicable withholding tax) based on the percentage of the calendar year through the date of termination of employment, multiplied by the bonus earned by the Employee in the immediately preceding calendar year.

      (c)    Without Cause. If Employee's employment is terminated Without Cause, pursuant to Section 2.2(e), Employee will be entitled to receive: (i) his base salary through the date of termination; plus (ii) six months' additional base salary (payable over the next six months consistent with normal payroll practice; plus (iii) any of his unused vacation pay; plus (iv) and unpaid bonus (if any) (subject to applicable withholding tax) based on the percentage of the calendar year through the date of termination of employment, multiplied by the bonus earned by the Employee in the immediately preceding calendar year.

Provided that Employee makes a timely election to continue coverage under the Company's group health plans pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985

3

("COBRA"), health insurance benefits with the same coverage (subject to Company's right to change coverage as set forth in the last sentence of this Section) provided to Employee prior to the termination (e.g. medical, dental, optical, mental health) will be provided at the Company's cost for eighteen (18) months following the termination date, but not longer than until Employee is covered by comparable health insurance benefits from another employer or is otherwise ineligible for COBRA continuation coverage. Nothing contained herein shall restrict the ability of the Company or its successor from changing some or all of the terms of such health insurance benefits, the cost to participants or other features of such benefits; provided, however, that all similarly situated participants are treated the same.

2.5    Business Expenses.

(a)    Reimbursement. The Company shall reimburse the Employee for all reasonable, ordinary, and necessary business expenses incurred by him in connection with the performance of his duties hereunder, including, but not limited to, ordinary and necessary travel expenses and entertainment expenses. The reimbursement of business expenses will be governed by the policies for the Company and the terms otherwise set forth herein.

(b)    Accounting. The Employee shall provide the Company with an accounting of his expenses, which accounting shall clearly reflect which expenses were incurred for proper business purposes in accordance with the policies adopted by the Company and as such are reimbursable by the Company. The Employee shall provide the Company with such other supporting documentation and other substantiation of reimbursable expenses as will conform to Internal Revenue Service or other requirements. All such reimbursements shall be payable by the Company to the Employee within a reasonable time after receipt by the Company of appropriate documentation therefore.

2.6    Cause. For purposes of this Agreement, "Cause" for Employee's termination will exist if the Company terminates Employee's employment for any of the following reasons: (i) Employee willfully fails to substantially perform his duties hereunder (other than any such failure due to his physical or mental illness), and such willful failure is not remedied within ten (10) business days after written notice from the Company's board of directors, which written notice shall state that failure to remedy such conduct may result in an involuntary termination for Cause; (ii) Employee engages in willful and serious misconduct (including, but not limited to, an act of fraud or embezzlement) that has caused or is reasonably expected to result in material injury to the Company or any of its Affiliates; (iii) Employee is convicted of or enters a plea of guilty or nolo contendere to a: (A) crime that materially adversely affects his ability to perform his duties on behalf of the Company; or (B) felony; or (iv) Employee engages in alcohol or substance abuse which adversely affects his ability to perform his duties.

**ARTICLE III**
**COMPENSATION AND BENEFITS**

3.1    Compensation. During Employee's employment, the Company shall pay Employee such salary, bonus and other benefits and awards as set forth on Exhibit A.

3.2    Payment. Except as otherwise provided herein, all compensation shall be payable in intervals in accordance with the general payroll payment practice of the Company. The

4

compensation shall be subject to such withholdings and deductions by the Company as are required by law.

3.3    Vacation.  The Employee shall be entitled to receive 120 hours of personal time off ("PTO") each year of the Employment Term beginning on the date hereof and continuing with each one year extension of the Employment Term; any PTO time not taken during each year of the Employment Term shall carry over to the next year, subject to a maximum aggregate carry over of 120 hours of PTO.

3.4    Other Benefits.  Employee shall be entitled to participate in any retirement, pension, profit-sharing, stock option, health plan, insurance, disability income, incentive compensation and welfare or any other benefit plan or plans of the Company which may now or hereafter be in effect and for which the Employee is eligible or for which all senior executives in general are eligible.  Notwithstanding the forgoing, the Company shall be under no obligation to institute or continue the existence of any such benefit plan.

## ARTICLE IV
## CONFIDENTIALITY, NON-SOLICITATION, NON-COMPETE AND QUIT CLAIM AGREEMENT

4.1    Non-Disclosure of Confidential Information.  Employee hereby acknowledges and agrees that, as of a result of the employment hereunder, Employee will acquire, develop, and use information that is not generally known to the public or to the Company's industry, including but not limited to, certain records, phone locations, documentation, software programs, price lists, customer lists, contract prices for the Company's services, business plans and prospects of the Company, equipment configurations, ledgers and general information, employee records, mailing lists, manufacturing techniques, product formulations, accounts receivable and payable ledgers, financial and other records of the Company or its affiliates, and other similar matters, as well as any information disclosed to the Company by any third party under which the Company has a confidentiality obligation to the third party (all such information pertaining to the Company, its affiliates or disclosed to Company under confidentiality from third parties being hereinafter referred to as "Confidential Information").  Employee further acknowledges and agrees that the Confidential Information is of great value to the Company and its affiliates and that the restrictions and agreements contained in this Agreement are reasonably necessary to protect the Confidential Information and the goodwill of the Company.  Accordingly, Employee hereby agrees that:

(a)    Employee will not, while employed by the Company or for two years thereafter, directly or indirectly, except in connection with Employee's performance of the duties under this Agreement, or as otherwise authorized in writing by the Company for the benefit of the Company or its "Affiliates" (as hereinafter defined), divulge to any person, firm, corporation, limited liability company, or organization, other than the Company or its Affiliates (hereinafter referred to as "Third Parties"), or use or cause or authorize any Third Parties to use, the Confidential Information, except as required by law; and

(b)    Upon the termination of Employee's employment for any reason whatsoever, Employee shall deliver or cause to be delivered to the Company any and all Confidential Information, including drawings, notebooks, notes, records, keys, disks data and other documents and materials belonging to the Company or its Affiliates which is in

5

his possession or under his control relating to the Company or its Affiliates or abstracts therefrom, regardless of the medium upon which it is stored, and will deliver to the Company upon such termination of employment any other property of the Company or its Affiliates which is in his possession or control.

4.2     Non-Solicitation Covenant.  Employee hereby covenants and agrees that while employed by the Company and for a period of one (1) year following the termination of the Employee's employment with the Company for any reason, Employee shall not: (i) directly or indirectly, endeavor to entice away from the Company or its Affiliates any person, firm, corporation, limited liability company or other entity that was a customer of the Company at any time while Employee was an employee of the Company or its Affiliates or who is a "prospective vendor or customer" of the Company; or (ii) induce, attempt to induce or hire any employee (or any person who was an employee during the year preceding the date of any solicitation) of the Company or its Affiliates to leave the employ of the Company or its Affiliates or to otherwise perform services directly or indirectly for others, or in any way interfere with the relationship between any such employee and the Company or its Affiliates.   For purposes hereof, "prospective vendor or customer" shall mean any person or entity which has been solicited for business by Employee or any officer or other employee of the Company or its Affiliates at any time during Employee's employment.

4.3     Non-Competition Covenant.  Employee acknowledges that the covenants set forth in this Section 4.3 are reasonable.  Employee also acknowledges that the enforcement of the covenants set forth in this Section 4.3 will not preclude Employee from being gainfully employed in such manner and to the extent as to provide a standard of living for himself, the members of his family and the others dependent upon him of at least the level to which he and they have become accustomed and may expect.  Employee hereby agrees that he shall not, during his employment and for a period of two (2) years after the end of his employment directly or indirectly, engage in any proprietorship, partnership, firms trust, company, limited liability company or other entity, other than the Company (whether as owner, partner, trustee, beneficiary, stockholder, member, officer, director, employee, independent contractor, agent, servant, consultant, manager, lessor, lessee, or otherwise) that competes with the Company in the Business of the Company in the Restricted Territory (as defined herein), other than acquiring an ownership interest in a company listed on a recognized Stock exchange in an amount which does not exceed five percent (5%) of the outstanding Stock of such corporation.  For purposes of this Agreement:  (i) the term "Business of the Company" shall include all business activities and ventures related to the sale of electronic shelf label systems and associated parts, components, software and products derivative of any of the foregoing, and all other businesses in which the Company subsequently is engaged in prior to, and on the date of, termination of Employee's employment; and (ii) the term "Restricted Territory" means any state in the United States of America.

4.4     Remedies.

(a)     Injunctive Relief.  Employee expressly acknowledges and agrees that a violation of any of the provisions of Sections 4.1, 4.2 or 4.3 could cause immediate and irreparable harm, loss and damage to the Company not adequately compensable by a monetary award.  Employee further acknowledges and agrees that the time periods and territorial areas provided for herein are reasonable in order to adequately protect the Business of the Company, the enjoyment of the Confidential Information and the goodwill of the Company.  Without limiting any of the other remedies available to the

6

Company at law or in equity, or the Company's right or ability to collect money damages, Employee agrees that any actual or threatened violation of any of the provisions of Sections 4.1, 4.2, or 4.3 may be immediately restrained or enjoined by any court of competent jurisdiction, injunction may be issued in any court of competent jurisdiction, without notice and without bond. Notwithstanding anything to the contrary contained in this Agreement, the provisions of this Article IV shall survive the termination of Employee's employment.

(b)    Enforcement:    It is the desire of the parties that the provisions of Sections 4.1, 4.2, or 4.3 be enforced to the fullest extent permissible under the laws and public policies in each jurisdiction in which enforcement might be sought. Accordingly, if any particular portion of Sections 4.1, 4.2 or 4.3 shall ever be adjudicated as invalid or unenforceable, or if the application thereof to any party or circumstance shall be adjudicated to be prohibited by or invalidated by such laws or public policies, such section or sections shall be: (i) deemed amended to delete there from such portions so adjudicated; or (ii) modified as determined appropriate by such a court, such deletions or modifications to apply only with respect to the operation of such section or sections in the particular jurisdictions so adjudicating on the parties and under the circumstances as to which so adjudicated.

(c)    Legal Fees.   In any action to enforce the terms of this Agreement, the prevailing party shall be entitled to reimbursement from the other party of reasonable legal fees and costs.

4.5    Company.    All references to the Company in this Article IV shall include "Affiliates" of the Company, as that term is construed under Rule 405 of the Securities Act of 1933, as amended.

4.6    Quit Claims.  By execution of this Agreement, Employee: (i) assigns and quit claims to the Company all right, title and interest as relates to the Business of the Company in any patentable or potentially patentable invention or design within the meaning of Title 35 of the United States Code, and any utility or design created or discovered by the Employee during the course of his employment with the Company; and (ii) agrees that if during the course of his employment by the Company, he discovers, invents or produces, without limitation, any information, formulae, product, device, software, system, technique, drawing, program or process, which is a "trade secret" within applicable law or deemed to be such in the opinion of the Company's board of directors, such information formulae, product, device, system, technique, drawing, program or process shall be assigned to the Company. Employee agrees to fully cooperate with the Company in:  (A) protecting the value and secrecy of any such trade secrets, and further agrees to execute any and all documents the Company deems necessary to document any such assignment to the Company; and (B) Employee designates the Company his attorney-in-fact to execute any documents the Company may deem necessary that relates to any such trade secret or assignment thereof to the Company.

Notwithstanding anything to the contrary herein, this Agreement does not apply to any invention ("Employee Owned Invention(s)") for which no equipment, supplies, facility or trade secret information of the Company was used and which was developed entirely on the Employee's own time, unless:  (a) the invention relates: (i) to the Business of the Company; or (ii) to the Company's actual research or development; or (b) the invention results from any work

7

performed by the Employee for the Company.  Except as noted on the signature page hereof, Employee claims no right in any inventions as of the date hereof.

**ARTICLE V**
**MISCELLANEOUS**

    5.1   <u>Notices</u>.  All notices or other communications required or permitted hereunder shall be in writing addressed to the last known address of the Party entitled to notice and shall be deemed given, delivered and received:  (a) when delivered, if delivered personally; (b) four (4) days after mailing, when sent by registered or certified mail, return receipt requested and postage prepaid; (c) one (1) business day after delivery to a private courier service, when delivered to a private courier service providing documented overnight service; and (d) on the date of delivery if delivered by telecopy, receipt confirmed, provided that a confirmation copy is sent on the next business day by first class mail, postage prepaid, in each case addressed as follows:

| | |
|---|---|
| To Employee at: | The address set forth on the signature page hereof. |

To Company at:      Tagnetics, Inc.
635 Olympic Drive
Troy, OH  45373
Attention:     President
Telephone:   937-320-9225
Facsimile:    937-552-9782
E-Mail:       rearley@tagnetics.com

*with a copy to:*

Mitchell D. Goldsmith, Esq.
c/o Shefsky & Froelich Ltd.
111 East Wacker Drive – Suite 2800
Chicago, IL  60601
Telephone:   312-836-4006
Facsimile:    312-275-7569
E-Mail:       mgoldsmith@shefskylaw.com

Any party may change its address for purposes of this paragraph by giving the other party written notice of the new address in the manner set forth above.

    5.2   <u>Entire Agreement; Amendments, Etc</u>.  This Agreement contains the entire agreement and understanding of the parties hereto, and supersedes all prior agreements and understandings relating to the subject matter hereof.  Except as provided in <u>Section 4.4(b)</u> above, no modification, amendment, waiver or alteration of this Agreement or any provision or term hereof shall in any event be effective unless the same shall be in writing, executed by both parties hereto, and any waiver so given shall be effective only in the specific instance and for the specific purpose for which given.

    5.3   <u>Benefit</u>.  This Agreement shall be binding upon, and inure to the benefit of, and shall be enforceable by, the heirs, successors, legal representatives and permitted assignees of Employee and the successors, assignees and transferees of the Company.  This Agreement or any

8

right or interest hereunder may not be assigned by Employee without the prior written consent of the Company.

5.4     No Waiver.  No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder or pursuant hereto shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder or pursuant thereto.

5.5     Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law but, if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provision of this Agreement.  If any part of any covenant is unenforceable or the making of any covenant hereunder is unenforceable, the parties hereto agree, and it is their desire, that the court shall substitute a judicially enforceable limitation in its place, and that as so modified this Agreement, as so modified, shall be binding upon the parties as if originally set forth herein.

5.6     Compliance and Headings.  Time is of the essence of this Agreement.  The headings in this Agreement are intended to be for convenience and reference only, and shall not define or limit the scope, extent or intent or otherwise affect the meaning of any portion hereof.

5.7     Arbitration.  If there is any dispute between the parties concerning any matter relating to this Agreement, the exclusive basis for adjudication of this Agreement (except with respect to the performance of the covenants and obligations as set forth in Article IV above) shall be by arbitration as detailed herein.  Either party may submit the dispute to binding arbitration. Any such arbitration proceeding will be conducted in Dayton, Ohio and except as otherwise provided in this Agreement, will be conducted under the auspices of JAMS/Mediation, Inc., in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association.  The arbitrator shall allow such discovery as the arbitrator determines appropriate under the circumstances.  The arbitrator shall determine which party, if either, prevailed and shall award the prevailing party its costs.  Each party will bear his, her or its respective attorneys' fees.  The award and decision of the arbitrator shall be conclusive and binding on all parties to this Agreement and judgment on the award may be entered in any court of competent jurisdiction.  The parties acknowledge and agree that any arbitration award may be enforced against either or both of them in a court of competent jurisdiction and each waives any right to contest the validity or enforceability of such award.  The parties further agree to be bound by the provisions of any statute of limitations which would be applicable in a court of law to the controversy or claim which is the subject of any arbitration proceeding initiated under the Agreement.  The parties further agree that they are entitled in any arbitration proceeding to the entry of an order, by a court of competent jurisdiction pursuant to an opinion of the arbitrator, for specific performance of any of the requirements of this Agreement.

In any action to enforce any of the provisions of Article IV hereof, the action shall be litigated in the state or federal courts situated in or closest to Dayton, Ohio, to which jurisdiction and venue all parties consent.  Each party hereby waives his, her or its right to trial by jury with respect to such action and agrees that the prevailing party such action shall be entitled to reimbursement from the other party of his, her or its legal fees and costs incurred in connection with such actions.  Company shall be entitled to injunctive relief, without the necessity of

9

posting bond to remedy any breach of any of the terms of <u>Article IV</u> of this Agreement by Employee.

     5.8    <u>Governing Law</u>. The parties agree that this Agreement shall be governed by, interpreted and construed in accordance with the laws of the State of Delaware. Any action to enforce the terms of this Agreement shall be litigated in the state or federal courts situated in or nearest to Dayton Ohio, to which jurisdiction and venue all parties consent. All parties waive their right to a jury trial with respect to litigation of this Agreement.

     5.9    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, whether by original, photocopy, facsimile or e-mail attachment in PDF format, each of which will be deemed an original and all of which together will constitute one and the same instrument.

     5.10    <u>Recitals</u>. The Recitals set forth above are hereby incorporated in and made a part of this Agreement by this reference.

     5.11    <u>Indemnification</u>. The Company shall indemnify and hold Employee harmless to the fullest extent permitted by law and under the Articles and bylaws of the Company as, to and from any and all costs, expenses (including reasonable attorneys' fees, which shall be paid in advance by the Company, subject to recoupment in accordance with applicable law) or damages incurred by Employee as a result of any claim, suit, action or judgment arising out of the activities of the Company or its Affiliates or the Employee's activities as an employee, officer or director of the Company or any related company; provided, however that the Employee shall not be entitled to indemnification hereunder to the extent the damages are the result of actions or omissions which have been finally adjudicated by a court of competent jurisdiction to constitute gross negligence or willful or intentional misconduct by the Employee. This provision shall survive the termination of this Agreement.

     5.12    <u>Survival</u>. Employee's obligations under <u>Article IV</u> hereof shall survive any termination of this Agreement.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed and delivered as of the day and year first above written.

COMPANY:

TAGNETICS, INC.

By: _Ronald E. Earley_____
    Ronald E. Earley, President

EMPLOYEE:

_____
JONATHAN HAGER

Address: _2170 River Oaks Drive_
       _Salem, VA 24153_

*Employee Owned Inventions:*   _None_

11

## EXHIBIT A

*Base Salary* .................... $155,000 per annum, subject to increase in the sole discretion of the Board of Directors of the Company.

*Bonus* ............................. Employee shall be entitled to earn an annual bonus as determined by the Board of Directors in its sole discretion, with a target not to exceed 50% of base salary in the event that the Company and Employee meet all criteria considered by the Board of Directors.

*Stock Options* ... ... ... ..... Employee shall be entitled to 5,000 options at or above current market price of $34.18 per share

*Benefits* ........................... Employee shall be entitled to receive all offered health benefits for himself and his family, in an amount not less than the greatest level of coverage offered to other employees in the Company. Employee will be eligible for consideration for annual grants with respect to the Company's stock option plan, as determined in the sole discretion of the Board of Directors.

1168096_2